In re I.G.

**Appeal of J.G., Sr., Biological Father.**

In re J.G.

**Appeal of J.G., Sr., Biological Father.**

Superior Court of Pennsylvania.

Submitted May 14, 2007.
Filed Dec. 21, 2007.

Reginald C. Allen, Philadelphia, for appellant.

Cynthia N. Keller, Philadelphia, for appellee.

BEFORE: KLEIN, KELLY, JJ. and McEWEN, P.J.E.

OPINION BY KLEIN, J.:

¶ 1 J.G., Sr. (Father) appeals from the order entered in the Court of Common Pleas of Philadelphia County terminating his parental rights to J.G., Jr. and I.G. Upon review, we conclude that: (1) the Philadelphia Department of Human Services (DHS) did not meet its burden of proving by clear and convincing evidence the statutory requirements for termination under 23 Pa.C.S.A. § 2511(a); (2) the record does not support the court's finding that no bond existed between Father and his children, *see* 23 Pa.C.S.A. § 2511(b), and (3) where the record is devoid of evidence of the effect of termination on the children, and the record does not support a finding of no bond between Father and children, termination of Father's parental rights is contrary to law. *See id.* We, therefore, reverse the order terminating Father's parental rights.

¶ 2 We take this opportunity to once again clarify the distinct steps the trial court must take in the two-part involuntary termination analysis and emphasize that the subsection (b) evaluation must be given more than mere lip service. What is most troubling here is that the trial court states in its opinion that "the record is devoid of testimony regarding the impact termination would have on the children[,]" and then simply concludes that the lack of evidence is inconsequential. In a case such as this, where an incarcerated parent faces termination of parental rights, it is critical that the fact of incarceration and the practical limits it imposes on the parent/child relationship not obscure the focus of the statutory inquiry.

*Facts*

¶ 3 The family became known to the DHS on October, 15, 2003, when DHS received a General Protective Services (GPS) report alleging that Mother had left the children with caretakers and did not retrieve them for approximately eight days. The report also alleged a history of domestic violence. DHS substantiated the report and, after the report was filed, Father took the children to live with him at his mother's apartment. Mother has since voluntarily relinquished her parental rights and is not a party to this appeal.

¶ 4 Father recognized that his mother's two-bedroom apartment was inadequate for him and the children because there were already four other children living there. Father therefore agreed to voluntarily place the children with the maternal grandparents, stating in a written agreement that his housing situation and job were unstable and that he "would like time to make it work out." (Voluntary Placement Agreement, 10/18/03, DHS Ex. 2, p. 1).

¶ 5 On October 25, 2003, the maternal grandparents informed DHS that they were no longer able to care for the chil-

dren and on November 3, 2003 DHS placed them in foster care. It was Father who then suggested kinship care with the paternal aunt and uncle, who reside in Warminster, Bucks County. The children were then placed with paternal aunt and uncle, where they remain at this time.

¶ 6 In May 2004, Father was incarcerated in Montgomery County. While he was serving one of two separate prison terms there, he failed to return while on furlough. As a result he faced additional incarceration as a fugitive from justice. During the six months immediately prior to the termination hearing, which was held on August 29, 2006, Father was incarcerated in Philadelphia County on charges of conspiracy, possession of drugs and possession of firearms.[1] At the time of the termination hearing, Father remained incarcerated, but he participated by telephone.

¶ 7 On November 8, 2006, the court terminated Father's parental rights. Father filed this timely appeal.

### Issues

¶ 8 Father argues that the court erred in terminating his parental rights because: (1) the evidence established that he "reasonably complied" with the FSP objectives; (2) the evidence of record did not establish his settled purpose to relinquish his parental rights since he maintained a "substantial relationship with his children" after and while he was incarcerated; (3) the court "ignored the fact that the Father and children maintained a parent-children bond" which was in the children's best interests not to sever; and (4) it was not in the children's best interests to sever the parent-children bond where relative placement was an alternative goal, and Father had requested the court to order relative placement. We agree with each of these claims.

### Discussion

¶ 9 Termination of parental rights is controlled by statute and requires a two-step analysis.[2] First, under 23 Pa.C.S.A. § 2511 the party seeking termination must prove by clear and convincing evidence one of the statutory requirements for termination listed under section 2511(a). Only if the court determines the parent's conduct warrants termination of his or her parental rights under section 2511(a) does the court engage in the second part of the analysis under section 2511(b).[3]

¶ 10 Here, DHS petitioned for termination under sections 2511(a)(1), (2), (5), and (8).[4] The trial court found clear and

---

1. At the time of the hearing, the Philadelphia charges were pending and the length of the term he had to serve in Montgomery County was not determined.

2. Our scope of review is broad and comprehensive, although our standard of review is narrow. We consider all the evidence, along with the legal conclusions and factual findings of the trial court and reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa.Super.2005).

3. (b) Other considerations.-The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

4. Sections 2511(a)(1), (a)(2), (a)(5) and (a)(8) provide as follows:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a

convincing evidence to support termination under each subsection. Based on our review, we find these conclusions are not supported by the record.

*Section 2511(a)(1) & (a)(2)*

■ ¶ 11 Incarceration alone is not sufficient to support termination under any subsection. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000) (en banc). The fact that Father is incarcerated does not support a finding that he has evidenced a settled purpose to relinquish his parental rights or has failed or refused to perform parental duties under (a)(1), or that Father's current incapability of performing parental duties cannot or will not be remedied by Father under (a)(2). The trial court acknowledged the fact that Father was incarcerated and that he made weekly telephone calls to the children. The court noted, however, that "parental responsibilities are not tolled during incarceration." *In re: D.J.S.*, 737 A.2d 283, 286 (Pa.Super.1999). "A parent desiring to retain parental rights must exert himself to take and maintain a place of importance in his child's life." *Adoption of Baby Boy A.*, 512 Pa. 517, 517 A.2d 1244, 1246 (1986). Our review of the record indicates that

Father has in fact made efforts to maintain a place of importance in his children's lives.

■ ¶ 12 Further, with respect to failure to perform parental duties under subsection (a)(1), as well as incapability under subsection (a)(2), the fact of incarceration alone cannot support termination. A parent's absence and failure to support a child due to incarceration is not conclusive on the issue of whether the parent has abandoned the child. This Court and the Pennsylvania Supreme Court have repeatedly held as much. *See, e.g., Adoption of Baby Boy A. v. Catholic Social Services of Diocese of Harrisburg, PA, Inc.*, 512 Pa. 517, 517 A.2d 1244 (1986); *In re D.J.S.*, 737 A.2d 283 (Pa.Super.1999); *Matter of Adoption of C.A.W.*, 453 Pa.Super. 277, 683 A.2d 911 (1996); *In Interest of J.E.S.*, 365 Pa.Super. 291, 529 A.2d 514 (1987); *In re Adoption of M.J.H.*, 348 Pa.Super. 65, 501 A.2d 648 (1985). Nonetheless, as the trial court noted, a parent's responsibilities are not tolled during incarceration, and therefore we must inquire whether the parent utilized those resources available while he or she was in prison to continue a close

petition is filed on any of the following grounds:

1. The parent by conduct continuing for a period of at least six months preceding the filing of the petition **either had evidenced a settled purpose of relinquishing parental claim to a child or has refused *or* failed to perform parental duties;**

2. The **repeated and continued incapacity**, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental wellbeing and the condition and causes of the incapacity, abuse, neglect or refusal **cannot or will not be remedied by the parent;**

5. The child has been removed from the care of the of the parent by the court or under voluntary agreement with an agency for a period of at least six months, the **condition which led to the removal or**

**placement of the child continue to exist,** the parent cannot or will not remedy those conditions within a reasonable period of time, the **services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal of the child within a reasonable period of time and termination of the parents rights would be best serve the needs and welfare of the child.**

8. The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, twelve months or more have elapsed from the date of the removal or placement, the **conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.**

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) (emphasis added).

relationship with the child. *Adoption of Baby Boy A., supra; In re D.J.S., supra; In Interest of J.E.S., supra.* We cannot simply assume that Father's current incapacity cannot or will not be remedied.

¶13 Dorcus Laney, the DHS social worker, testified, although vaguely, that the December 16, 2003 family service plan provided Father with several objectives:

> A: Amongst other things, parenting, the anger management, maintaining contact with the Department, and in so doing maintaining contact with his children.
>
> Q: And to date, has father achieved any of these objectives?
>
> A: He has maintained limited contact with his children via telephone calls and prior to that he was visiting. But inasmuch now that he is incarcerated and has been since I've known the family, it has been very limited.

(N.T. Hearing, 9/29/06, at 32). Laney also testified that there was no documentation as to anger management or parenting classes. *Id.* at 33–34. Notably, Laney had not been assigned to the case until January 2005, so it is unclear what occurred during the prior year. *Id.* at 14. Laney also acknowledged that she had never met Father prior to the day of the hearing, (*id.* at 47), which was nineteen months after her assignment to the case. It is also telling that Laney stated at the hearing that during the nineteen months that she was the assigned social worker for the case, she had not spoken with Father. (*Id.* at 47–48).

¶14 Laney also testified that while Father was incarcerated, Father was granted permission to contact his children at paternal aunt's home on the weekends. *Id.* at 35. Though DHS emphasizes that Father's contact with the children was "limited," from the record it appears that this limitation was imposed by DHS, or possibly paternal aunt.

¶15 A searching inquiry, which was lacking here, is particularly critical in a case such as this, where: (1) Father was brought into this process as a result of both Mother's abandonment and his own agreement to voluntary place the children; (2) Father sought out and recommended kinship care when DHS placed the children in foster care; (3) the children are currently placed and are doing well with the paternal aunt and uncle; (4) Father has, through requests for visits,[5] letters, and weekly phone calls, made a sincere effort to maintain a place of importance in his children's lives; and (5) there is no clear indication in the record of the remaining jail time Father faces, if any at this point.[6] All of these factors lend credence to Father's claim that DHS failed to carry its burden. *Cf. In re Adoption of M.J.H., supra* (termination of father's parental rights was warranted for repeated and continued incapacity where father, by reason of his incarceration for life, faced repeated and continued incapacity which would cause child to be without essential parental care, control or subsistence necessary for her physical and mental well-being and conditions and causes of that incapacity could not be remedied by father

---

5. Father did acknowledge that the foster mother and DHS did not want to bring the children to the jail where he was incarcerated, and this is supported in the record. We take no stance on this, but we note at the same time that DHS cannot use that decision to support a claim that Father did not maintain contact.

6. At the time of the hearing, the lengths of Father's prison sentences were undetermined. It was known that after completing his sentence in Philadelphia County, he would have to finish serving his original Montgomery County sentence from which he had fled, as well as another Montgomery County sentence for fleeing from justice.

notwithstanding his sincere effort to perform parental duties).

¶ 16 It is evident from the record that Father has tried to do the right thing and assume parental responsibility, first when Mother left the children, and then in acknowledging his overcrowded living conditions and signing a voluntary placement agreement, and finally in seeking out kinship care for the children. What is also apparent from this record is that this is not the case of a Father who simply doesn't care. It is certainly not clear from this record that Father has evidenced a settled purpose to relinquish his parental rights or is without a doubt unable, unwilling or incapable of performing his parental duties. 23 Pa.C.S.A. § 2511(a)(1), (2).

*Section 2511(a)(5)*

■ ¶ 17 With respect to the court's determination under section 2511(a)(5) that the conditions which led to the removal or placement of the children continue to exist, that Father cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available are not likely to remedy the conditions which led to the removal of the children within a reasonable period of time, and termination of the parents rights would best serve the needs and welfare of the children, we again find a lack of support in the record.

¶ 18 Father voluntarily placed the children due to his housing situation. Father testified that the home that he and the children were living in, his mother's home, was "too small" but that at that time he was working at the Holiday Inn Express and would come during his lunch break to visit his children. (N.T. Hearing, 8/26/06, at 58). Father also testified that he worked a second job as a mechanic at M & C Auto Repair. (*Id.* at 60).

¶ 19 At the time of the hearing, the fact of Father's incarceration rendered him un-

able to remedy the inadequate housing condition. However, there was little testimony in the way of provision of services available to Father, and, again, there remains no information in the record giving any approximation of when Father would be out on parole and the likelihood of Father's ability to remedy that condition with available services. Based on Father's uncontradicted testimony that he worked two jobs and paid child support when Mother had the children, (*id.* at 61), it seems that Father would be quite likely to remedy that condition. Again, this is dependent upon the issue of incarceration which is not clear in this record. Notably, it was *not* Father's incarceration that led to removal of the children, yet that appears to be the basis for seeking termination. *See In re S.D.T., Jr.,* 934 A.2d 703 (Pa.Super.2007) (where conditions that led to removal, namely repeated rounds of incarceration and substance abuse, continue to exist, court could reasonably conclude based on history in record that Father was not likely to remedy those conditions in reasonable amount of time).

¶ 20 The record here does not support a determination that DHS proved by clear and convincing evidence that services would not likely resolve the housing issue or that this condition could not be remedied within a reasonable amount of time. 23 Pa.C.S.A. § 2511(a)(5).

*Trial Court's Examination of Parent–Child Bond under Section 2511(b)*

¶ 21 Where the record does not support termination under subsection (a), it is unnecessary to address the subsection (b) analysis. However, because of the apparent confusion in this particular case, we find it necessary to explain the deficiencies in the court's analysis under subsection (b) as well. If the court determines the parent's conduct warrants termination of his

or her parental rights under section 2511(a), which it did here, the court goes on to the second part of the analysis under section 2511(b), a needs and welfare analysis.[7] This is mandated by the statute governing termination of parental rights and it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights. A primary aspect of the needs and welfare analysis concerns the *nature and status of the emotional bond between parent and child.*

¶ 22 Under subsection (b), the trial court's focus is not on the parent's conduct, but on the child and his or her needs. This analysis includes weighing the needs and welfare of the child, as well as an examination of the emotional bond between parent and child, *In re: D.W.*, 856 A.2d 1231, 1234 (Pa.Super.2004), which "encompasses intangibles such as love, comfort, security, and stability." *In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa.Super.2006) (citation omitted).

■ ¶ 23 When the trial court detects a bond between a parent and child, it must consider the effect of severing that bond on the child before concluding whether termination is proper. *Id.* Our Supreme Court has stated that:

> To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists . . . is not proper.

*In re E.M.*, 533 Pa. 115, 620 A.2d 481, 485 (1992). *See In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super.2006); *In re Adoption of Godzak*, 719 A.2d 365, 368 (Pa.Super.1998).

■ ¶ 24 Here, the trial court determined that no bond existed between Father and the children. This is not, however, supported in the record.

¶ 25 Father testified that he believed the children were emotionally bonded to him, that his children know who he is and refer to him as "Daddy," that they tell him they love him, and that after the last in-person visit, in October of 2005, the children cried when they left him and he cried as well. (N.T. Termination Hearing, 8/29/06, at 64–65).

¶ 26 Father stated that in the last six months he called his children every two days, but was only able to get through on a weekly basis. (*Id.* at 66). Father also testified that he wanted his children to visit him, but DHS opposed this and obtained a court order prohibiting visits, and that he was trying his best "to maintain contact to see my kids and to give them whatever they need[.]" (*Id.* at 69). Father also stated that he kept abreast of his children's health and medical conditions. (*Id.* at 68).

¶ 27 Father's testimony was not contradicted.

¶ 28 This evidence suggests that there may in fact be a bond between Father and children. *Cf. In re L.M.*, 923 A.2d 505, 512 (Pa.Super.2007) (where only evidence to support existence of parent-child bond was

---

7. Section 2511(b) states:

[T]he court in terminating the rights of a parent shall give primary consideration to the development, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishing, income, clothing and medical if found to be beyond the control of parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

mother's claim that she loved her child, no parent-child bond existed and section 2511(b) was satisfied where no evidence suggested that parent would be able to establish bond with children in foreseeable future, and where children had bonded with foster parents).[8]  Here, where there is no evidence of record to contradict Father's testimony, a bond may in fact be present.  Since Father's testimony was uncontradicted, we find that the court's determination that no bond exists is unsupported.  Though it may be that in fact no bond exists, on this record we are unable to find support for the court's finding.

¶ 29 Further, there was absolutely no testimony concerning the likely effect on the children of permanently severing any bond that might exist.  *The trial court acknowledged as much in its opinion,* stating that "the record is devoid of testimony regarding the impact termination would have on the children." (Trial Court Opinion, 1/23/07, at 11).  *See In re R.L.T.M.,* 860 A.2d 190, 195 (Pa.Super.2004) (where emotional bond is present between parent and child, court *must* consider effect of its permanent severance on child).

¶ 30 Since the court determined that DHS had met its burden under subsection (a), it was incumbent upon the court to analyze the effect of termination on the children.  Without evidence of the impact termination would have on the children, a court cannot conduct the subsection (b) analysis.  It is disturbing that the court summarily concluded that the lack of evidence on the effect of termination was inconsequential.  This is contrary to our Supreme Court's directive: "To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists … is not proper."  *In re E.M.,* 620 A.2d at 485.  Moreover, it impedes appellate review.

¶ 31 The court also stated that despite the lack of evidence on the effect of termination on the children, "at the time of the hearing, the children had not had any in-person contact with Father for nearly one (1) year[.]"  We suggest that this was not for Father's lack of trying.  The record indicates that Father wanted the children to visit, however, for reasons that are not entirely clear from the record, DHS apparently obtained a court order precluding visits.  Further, we point out that this is no substitute for a subsection (b) analysis.

¶ 32 The court's finding that no bond exists is not supported in the record and its conclusion that termination would have no effect on the children, without evidence of such, cannot stand.  *See In re C.P.,* 901 A.2d 516, 522 (Pa.Super.2006) (where record is devoid of evidence concerning effect that termination would have on children, trial court is unable to assess the needs and welfare of the children under section 2511(b) when terminating parental rights); *In re C.W.S.M.,* 839 A.2d 398, 404–05 (Pa.Super.2003) (concluding record revealed lack of evidence as to effect of termination on children; court reversed termination order and remanded to allow parties opportunity to present testimony concerning emotional bond between parent and children and likely effect of termination on children); *In re Adoption of A.C.H.,* 803 A.2d 224, 228 (Pa.Super.2002) (same).[9]

8.  We note that Edward Conroy, the court-appointed children's advocate, took no position on termination.  (N.T. Hearing, 8/29/06, at 105–106).

9.  We suggest that at the next status or review hearing the trial court may benefit from (a) updated information on Father's pending charges in Philadelphia County and Father's

### Conclusion

¶ 33 "It is the policy of this Commonwealth to preserve and protect the family whenever possible." *In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1240 (1978), *cert. denied sub. nom. Beatty v. Lycoming County Children's Services*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). In recognition of the primacy and sanctity of the family, our Supreme Court has stated:

> A family is an institution which preceded governments. Its sanctity was universally recognized before judges or statutes or constitutions or welfare organizations were known to man. The right of a child to a [parent] and a [parent] to a child are rights created by natural law. They are rights attributable to the nature of mankind rather than to the enactments of law.

> It is a serious matter for the long arm of the state to reach into a home and snatch a child from its [parent]. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity.

*In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780, 783 (1955). Balancing these fundamental principles with the state's interest in achieving stability and permanency for the dependent child is the delicate and difficult task the trial courts face in termination cases. Today we reaffirm the state's responsibility to these principles and emphasize that this responsibility, as well as this Court's ability to effectively review the case, requires the trial court's comprehensive evaluation of the case under the parameters of the termination statute. *See Appeal of R.J.S.*, 901 A.2d 502 (Pa.Super.2006); *Appeal of C.P.*, 901 A.2d 516 (Pa.Super.2006).

¶ 34 Order reversed.

---

remaining prison term, if any, in Montgomery County; (b) the testimony of paternal aunt; (c) the social worker's observations of the children, now ages five and six, with respect to the bond between them and Father; and (d) consideration of permanent legal custody in paternal aunt, which would not lead to termination of Father's parental rights, in particular since the record indicates that paternal aunt would be willing for the children to have a relationship with Father and that Father and paternal aunt have a good relationship. We also acknowledge the good words both parties have used in reference to paternal aunt, as well as the children's progress in her care. This, however, cannot replace the statutory standard of proof for termination or a searching and considered analysis of the parent-child bond and the effect termination would have on the children.