**In re P.S.S.C. and P.D.S.C.**

**Appeal of R.S.A., Father.**

Superior Court of Pennsylvania.

Submitted Sept. 12, 2011.

Filed Nov. 29, 2011.

Jacob C. Lehman, Philadelphia, for appellant.

Jon F. Arnold, Lebanon, for Chaulizant, appellee.

Loreen M. Burkett, Lebanon, for appellee, Guardian Ad Litem.

Roberta J. Gantea, Lebanon, for Lebanon County Children and Youth, appellee.

BEFORE: DONOHUE, LAZARUS, and FITZGERALD*, JJ.

OPINION BY LAZARUS, J.:

R.S.A. (Father) appeals from the trial court's order involuntarily terminating his parental rights to his minor children, P.S.S.C. and P.D.S.C. The record amply supports Father's contention that his language barrier and lack of counsel made it impossible for him to understand and act upon his parental rights and responsibilities regarding the termination process, which were all communicated in English. Because of this language impediment, there is insufficient evidence on the record before us to support termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a). Thus, we reverse.

Father is Spanish-speaking.[1] P.S.S.C. and P.D.S.C. (Children) were born in Puerto Rico in 1999 and 2001, respectively. Children lived in Puerto Rico with Father and Mother[2] until Father was incarcerated in Puerto Rico in March 2005 as a result of a drug conviction. At that time, Mother took Children to Lebanon, Pennsylvania. In December 2006, after Mother abandoned Children[3] to return to Puerto Rico, Lebanon County Children & Youth Services (LCCYS/agency) took custody of Children.[4] Mother did not provide LCCYS with Father's address, only telling the agency that he was incarcerated.

On May 2, 2007, LCCYS obtained Father's prison address from Mother's caseworker. LCCYS sent copies of the permanency plans and notice of review hearings to Father *via* certified mail each time that a review occurred.[5] However, all plans and notices were in written in English. *Id.* at 17, 36. No attempt was made by LCCYS to discern whether Father spoke or read the English language or whether he ever received the notices. The LCCYS certified mail card was signed by someone at the jail, but it was not Father's signature. *Id.* at 14, 18. Despite several failed attempts by Father to contact Children's LCCYS caseworker,[6] LCCYS changed the goal to adoption in July 2008.[7]

---

* Former Justice specially assigned to the Superior Court.

1. Father and Mother were born in Puerto Rico. Despite the trial court's statement that it seriously questions Father's ability to speak English, there is no support for such a determination in the entirety of this record.

2. Mother's parental rights have also been involuntarily terminated. She is not a party to this appeal.

3. Mother did, however, return to Puerto Rico with another child who was from a different father. When Mother left Lebanon County to return to Puerto Rico, she left Children in the care of a friend who later called the agency to tell them that she could no longer provide for them. When LCCYS workers arrived to pick up Children they were "filthy and had head lice." N.T. Termination Hearing, 5/10/2011, at 5.

4. They were subsequently placed in foster care and remain with the same foster family that now seeks to adopt them.

5. LCCYS caseworker, Rose Marie Urban, testified that the agency also called the jail each time there was a review hearing, but never received an answer at that phone number. N.T. Termination Hearing, 5/10/2011, at 14.

6. Father asked his mother (Paternal Grandmother) to attend the goal change hearing for him, but she was not permitted to enter the hearing room. N.T. Termination Hearing, 5/10/2011, at 20.

7. Caseworker Urban also testified that she would have set goals for Father *after* his release from incarceration; however, because the goal was changed to adoption prior to his release, no goals were ever set for him. N.T. Termination Hearing, 5/10/2011, at 15.

Father was released from prison in December 2009; upon his release he secured a Spanish–to–English interpreter and had her ask LCCYS for a legal aid application.[8] LCCYS never provided him with the requested legal aid papers; instead, Children's caseworker told Father that Father had agreed to receive and sign papers regarding voluntarily surrendering his parental rights to Children. Father refused to sign the termination papers. Thereafter, Father temporarily moved in with Mother in Puerto Rico.

In March 2010, Father moved to Texas to live with his mother. Despite his move from Puerto Rico to Texas, Father continued to call LCCYS to speak with Children and asked again that the Agency provide him a legal aid application, which it ultimately provided, almost four years after LCCYS took Children into custody. After making application and securing counsel,[9] Father twice travelled to Lebanon County, Pennsylvania to attend termination hearings in January 2011 [10] and May 2011. At no time did LCCYS attempt to facilitate visitation or communication by Father with Children.

On May 10, 2011, the court held the final termination hearing, where a court-approved interpreter appeared and translated the testimony from English to Spanish and Spanish to English. Father's attorney asked Father on direct examination whether he speaks English. N.T. Termination Hearing, 5/10/2011, at 33. Father answered, "no." *Id.* Father continued to testify that all of the papers sent to him from LCCYS after March of 2007 were written completely in English and that he was unable to understand them. *Id.* at 36.[11] Father also testified that he was under the impression that he could not have any contact with Children, including speaking with them over the phone. *Id.* at 42.

LCCYS caseworker Rose Marie Urban testified that Father only once provided gifts to Children—at the January 2011 termination hearing. She also testified that during the duration of Children's placement, Father never contacted her regarding their health and welfare, visited them, participated in any review hearings, or paid support. *Id.* at 16. Moreover, LCCYS caseworker Kimberly Miller testified that on January 15, 2010, she sent Father a copy of the petition to terminate with the original hearing date and that the envelope came back "unclaimed." *Id.* at 28. After further investigation, Miller was able to obtain a correct address and phone number for Father. LCCYS caseworker Carmen Portes spoke with Father in Spanish, at that phone number, on March 29,

---

8. *See* 23 Pa.C.S.A. § 2313(a.1) ("The court shall appoint counsel for a parent whose rights are subject to termination in an involuntary termination proceeding if, upon petition of the parent, the court determines that the parent is unable to pay for counsel or if payment would result in substantial financial hardship.").

9. On January 11, 2011, the court appointed Colleen Gallo, Esquire, to represent Father in the instant termination proceedings. Order of Court, 1/11/2011. However, Jacob Lehman, Esquire, represented Father at the May 10, 2011 termination hearing.

10. This hearing was ultimately rescheduled and held on May 10, 2011.

11. *See* Pa.O.C.R. 15.4 (notice of hearing on petition to involuntarily terminate parental rights must be given to parent whose rights are sought to be terminated); Pa.O.C.R. 15.6 (notice to every person to be notified shall be personal service at residence or registered or certified mail to last known address; under Rule 15.4 if registered or certified mail is returned undelivered then further notice by publication or otherwise shall be given).

2010. *Id.* at 29. LCCYS caseworkers sent another termination petition and notice of hearing to Father at a Texas address on May 19, 2010; the documents were again written in English. *Id.* at 30. On July 10, 2010, caseworkers sent Father, at the same Texas address, the second petition, this time written in Spanish. *Id.* at 30–31. On November 10, 2010 they sent him notice of the hearing. *Id.* at 31. Subsequently, Ms. Portes spoke with Father to verify his identity (birthdate) and the hearing date. *Id.* at 32. On December 7, 2010, Father requested appointment of counsel and was subsequently provided with an application for counsel. *Id.*

On cross-examination, Children's guardian *ad litem* asked Father if he would be surprised that one of his daughters remembers speaking to him in English during a 2008 phone conversation and that she also stated that "he speaks English [and] I can understand him and he can understand me." *Id.* at 44. Father responded that at the time his niece was interpreting the conversation. *Id.*

Children's guardian *ad litem* testified at the termination hearing that the children are "very anxious to be adopted" and that "any further continuances or delays in the adoption will . . . further emotionally damage [them]." *Id.* at 63. The trial court ultimately terminated Father's parental rights under 23 Pa.C.S.A. §§ 2511(a)(1), (a)(5), and (a)(8).[12] At the conclusion of the hearing, the trial court stated on the record the reasons for terminating *Mother's* rights; there is no similar statement regarding what clear and convincing evidence supported terminating *Father's* parental rights. *See id.* at 65–70.

On appeal, Father raises the following issues for our review:

(1) Did the trial court commit an error of law and/or abuse its discretion when it terminated Father's parental rights because Lebanon County Children & Youth Services failed to meet its burden of proving by clear and convincing evidence that Father showed a settled intent to relinquish his parental claim to the minor children and/or refused to perform parental duties for the minor children for a period of at least six months

---

**12.** *See* 23 Pa.C.S.A. § 2511. Grounds for involuntary termination.

    (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

        (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

        \*   \*   \*

        (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the

parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

        \*   \*   \*

        (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (5),(8).

prior to the filing of the petition for involuntary termination?

(2) Did the trial court commit an error of law and/or abuse its discretion when it terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5) or (a)(8) because Lebanon County Children & Youth Services failed to meet its burden of providing by clear and convincing evidence that Father met the requirements for termination of parental rights set forth in those subsections?

Here, LCCYS petitioned to terminate Father's parental rights under sections 2511(a)(2) and (5). In its termination petition, the agency lists the fact that "said natural parents did not successfully complete the goals of the permanency plans dated December 20, 2006, copies of which are attached hereto, marked Exhibits "E" and "F[.]" LCCYS Petition for Involuntary Termination, 12/29/2009, at 4. However, those permanency plans do not list Father as one of the parties for whom goals have been established. In fact, the plans state that goals for Father "will be added to the plan if [Father's] whereabouts become known and he intends to be a part of his girls' lives." Permanency Plans, 12/20/06, at 3. Moreover, the allegation that Father did not successfully complete his goals is completely inconsistent with LCCYS caseworker Urban's testimony that Father *would have been given* goals if the goal had not changed to adoption prior to his release from jail. *See infra* note 4 and accompanying text.

Where an incarcerated parent faces termination of parental rights, it is critical that the fact of incarceration and the practical limits it imposes on the parent/child relationship not obscure the focus of the statutory inquiry. *In re I.G.*, 939 A.2d 950, 951 (Pa.Super.2007). Termination of parental rights is controlled by statute and requires a two-step analysis. The first step requires that the party seeking termination prove *by clear and convincing evidence* one of the statutory requirements for termination listed under section 2511(a).[13] The well-established requirement, that the evidence be clear and convincing in order to prove termination under section 2511(a), exists to further protect against government interference with the family relation and the values it serves. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see also In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1240 (1978); *In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780, 783 (1955) ("A family is an institution which preceded government. Its sanctity was universally recognized before judges or statutes or constitutions or welfare organizations were known to man.").

With regard to the termination of parental rights, the appellate court's scope of review is broad and comprehensive, although its standard of review is narrow. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa.Super.2005). The appellate court considers all the evidence, along with the legal conclusions and factual findings of the trial court, and will reverse only if it finds an abuse of discretion, an error of law, or insufficient evidentiary support. *Id.*

---

13. Only if the court determines the parent's conduct warrants termination of his or her parental rights under section 2511(a) does the court engage in the second part of the analysis under section 2511(b). Because we conclude that there was insufficient evidence to terminate under section 2511(a), we need not engage in the second part of the termination analysis.

It is well established that under 23 Pa.C.S.A. § 2511(a)(1), incarceration alone cannot support termination due to a parent's failure to perform parental duties. *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652, 655 (1975). Moreover, a parent's absence and failure to support a child due to incarceration is not conclusive on the issue of whether the parent has abandoned the child. *Id.* Nonetheless, a parent's responsibilities are not tolled during incarceration, and therefore the court must inquire whether the parent utilized those resources available while he or she was in prison to continue a close relationship with the child. *I.G., supra* at 953.

We find that Father attempted to utilize the resources available to him through LCCYS while he was in prison—albeit to no avail. The bottom line is that the resources made available to him while he was incarcerated were completely inadequate for an unrepresented Spanish-speaking individual without access to an interpreter.[14] In essence, the "services or assistance reasonably available" to Father by LCCYS were simply not "available" in light of the language barrier. *See* 23 Pa. C.S.A. § 2511(a)(5).

We distinguish this case from the facts in *Adoption of Baby Boy A. v. Catholic Social Services Diocese of Harrisburg, Pennsylvania*, 512 Pa. 517, 517 A.2d 1244 (1986), which is cited in the argument section of LCCYS's appellate brief. In *Baby Boy A.*, appellant father was illiterate and incarcerated when he was told about the birth of his child by a Catholic Social Services worker. *Id.* at 1245. Father refused to voluntarily consent to termination of his parental rights to the child. *Id.* The trial court found that Father did nothing to try to find out more about the child or have any communication with his child while he was incarcerated—a period of fifteen months. *Id.* Although the court acknowledged that "[father's] illiteracy hindered his meaningful participation in child's life while he was in prison, [the court was] unwilling to hold that the law expects nothing from him at all." *Id.* In terminating Father's rights, the trial court stated, "Even an illiterate prisoner can show some interest in his child's well-being and we now hold that the law of Pennsylvania requires him to do so if he wishes to retain an absolute right to parental status unaffected by the consideration of how ill-served the child's interest is by that tie." *Id.* at 1245–46.

Unlike the facts in *Baby Boy A,* here, Father was completely unable to understand or communicate with his English-speaking Children and LCCYS caseworkers. This represents a much more severe impediment than that faced by the father in *Baby Boy A* who, although unable to read English, had the ability to verbally communicate with his child and social services workers throughout the termination process. Father's language barrier not only prevented him from reading English (like the father in *Baby Boy A* ), but it also foreclosed any opportunity to have effective communication with Children or LCCYS caseworkers in their native tongue, English. Moreover, despite the language barrier, Father made numerous attempts to contact LCCYS to find out about his children and his parental rights and was also under the impression, however misguided, that he was not permitted to talk to or see his children. Father in *Baby*

---

**14.** Under Pennsylvania case law, indigent petitioners are eligible for counsel in termination proceedings. *See In re R.I.*, 455 Pa. 29, 312 A.2d 601 (1973).

*Boy A* did *nothing* to fulfill his parental responsibilities for the entire fifteen months he was incarcerated.

This is, no doubt, a close case. However, the fact that there is insufficient evidence in the record to conclude that Father could actually read the various notices, plans, and petitions regarding termination of his parental rights tips the scale in favor of Father. It is not clear from the record that Father evidenced a settled purpose to relinquish his parental rights or was unable, unwilling, or incapable of performing his parental duties based upon his apparent limitation—not understanding the English language.

Casework Urban testified that she did not make any effort to contact Father about any LCCYS plan after his release from incarceration because the goal had changed to adoption. *Id.* at 15, 17–18. Other than mailing Father notices of review hearings and the permanency plan to his jail and unsuccessfully calling Father in prison, Urban did nothing actively to foster meaningful communication between Father and Children. In fact, the only Spanish-speaking LCCYS caseworker involved in the case, Carmen Portes, was not only admittedly hard to reach over the phone, but she did not even have any contact with Father until after his release from prison. *Id.* at 41, 18.

In its Rule 1925(a) opinion, the trial court concludes that it "seriously question[s] Father's credibility on th[e] issue [of whether he can speak English]." Trial Court Opinion, 7/19/2011, at 14. The court

then states that "Father had his opportunity to be heard and had the chance to defend himself because he provided testimony at the hearing." *Id.* at 14–15.[15] Although we are reticent to question a trial court's credibility determination, where that determination is not supported in the record we cannot let it serve as the basis for termination.

In addition, the fact that Father was entitled to representation for the termination proceedings, and did not receive counsel until less than four months prior to his parental rights being terminated, is further support for finding that the evidence was lacking to prove termination under section 2511(a) (statute requires a minimum of six months' behavior to provide grounds for involuntary termination). Our decision today does not ignore the well-established and sound policy of preventing children from languishing in foster care, with its inherent lack of permanency. Despite the trial court's conclusion that Father failed to perform his parental duties and that termination would be in Children's best interests, it was *LCCYS's* failure to provide any meaningful services or communication with Father [16] regarding his parental rights that essentially caused Father's "forced" abandonment of Children. Due process requires that we protect Father's parental rights as much as the recognized interests of Children. It is for that reason that we must reverse.

Order reversed. Jurisdiction relinquished.

---

**15.** We note that at the termination hearing Father had the benefit of a certified court interpreter.

**16.** Father testified that the only Spanish-speaking LCCYS caseworker involved in his

case, Carmen Portes, was so hard to reach over the phone that he only spoke to her a total of three to four times. N.T. Termination Hearing, 5/10/2011, at 41.