J-S13030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: K.B.B., A MINOR<br>IN RE: T.M.B., A MINOR<br>IN RE: D.Z.C., A MINOR | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| APPEAL OF M.C., NATURAL MOTHER | Nos. 1414 WDA 2015,<br>1415 WDA 2015,<br>1416 WDA 2015,<br>1417 WDA 2015,<br>1418 WDA 2015,<br>1419 WDA 2015,<br>1460 WDA 2015,<br>1461 WDA 2015,<br>1462 WDA 2015 |

Appeal from the Orders Entered August 12, 2015 and the Decrees Entered
August 24, 2015
In the Court of Common Pleas of Blair County
Orphans' Court and Civil Division at Nos: 2014 AD 39, 2014 AD 39A, 2014
AD 39B, CP-07-DP-00048-2013/FID: 07-FN-00027-2013, CP-07-DP-00047-
2013/FID: 07-FN-00027-2013, CP-07-DP-0000046-2013

BEFORE:  LAZARUS, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 19, 2016**

Appellant, M.C. ("Mother"), appeals from the August 12, 2015 goal

change orders and the August 24, 2015 decrees terminating her parental

rights to D.Z.C. (born 2007), T.M.B. (born 2011), and K.B.B. (born 2013)

_____

[*] Former Justice specially assigned to the Superior Court.

(collectively, "Children") and changing their permanency goals to adoption.[1]
We affirm.

Police removed the Children from Mother's care on May 5, 2013, when police discovered Mother unconscious in her home, leaving the Children unattended.[2] The family's home was in poor condition. Mother testified that she became unconscious because she was ill after the recent birth of K.B.B. Investigation revealed that Mother was hemorrhaging from birth complications. After a June 24, 2013 hearing the trial court adjudicated the Children dependent and placed them in foster care. The office of Blair County Children and Families ("CYF") developed a service plan to help Mother work toward reunification with the Children. Among Mother's goals was cooperation with CYF's service providers, including attendance of scheduled visits with the Children; obtaining mental health services; maintaining suitable housing; and resolving an allegation of abuse based on one child's diaper rash. Mother was compliant and made progress in several

_____

[1] The trial court also terminated the parental rights of T.E.P, father of D.Z.C., and M.W.B, father of T.M.B. and K.B.B.. The fathers have not appealed.

[2] The Commonwealth charged Mother with endangering the welfare of children, and Mother was accepted for alternative rehabilitative disposition ("ARD") on May 17, 2014. The Commonwealth filed a petition to revoke ARD in April of 2015. The status of that petition is not of record. The record also reflects that Mother's first child died as an infant when she left the child in the care of an abusive boyfriend. N.T. Hearing, 6/16/15, at 97-101. The record indicates a criminal investigation of the child's death is pending. *Id.*

areas, though her housing situation remained unstable. The allegation of abuse was deemed unfounded.

In February of 2014, Mother decided to end her cohabitation with M.W.B, father of T.M.B. and K.B.B. Mother testified that M.W.B. was abusive. N.T. Hearing, 6/16/15, at 99-100. Mother stayed with a friend while searching for housing. Mother's housing search was difficult because two prior evictions and the pending charge for endangering the welfare of children rendered her ineligible for subsidized housing. Mother hoped to have the Children move in with Mother, but at a safety inspection, the friend informed investigators she intended to move within a week and that Mother would not accompany her. Informed of this, the trial court convened a hearing on June 19, 2014 at which it changed the placement goal to adoption, directed CYF to proceed with a termination of parental rights ("TPR") petitions, and directed Mother 30 days to procure suitable housing. Mother leased an apartment at 1009 16th Avenue, Altoona, in August of 2014. The trial court conducted further hearings on September 24, 2014 and October 7, 2014. On December 8, 2014, the trial court denied the TPR petitions and changed the placement goal from adoption to reunification.

In denying the first TPR petition, the trial court counted Mother's decision to move away from M.W.B. as a sign of growing strength, especially since she also had suffered abuse at the hands of T.E.P. Trial Court Opinion, 12/9/14, at 5. The trial court also noted Mother's steadfastness in her

housing search, despite the complications brought on by her prior convictions and criminal record. *Id.* at 6. Also, Mother regularly attended scheduled visits with the Children, maintained phone contact, and attended church and doctor appointments with the Children. *Id.* at 8. Mother was attending counseling and appeared to have obtained permanent and suitable housing. *Id.* at 11.

Subsequently, Mother's attendance at counseling became sporadic despite the agency offering transportation to the sessions. N.T., 3/31/15, at 61. Mother's mental health was in worse condition as of March of 2015 than it had been when services first commenced. *Id.* at 74. Likewise, Mother failed to attend various appointments for various physical ailments, including a serious dental condition. *Id.* at 74-76; N.T. Hearing, 4/9/15, at 94-95; N.T. Hearing, 6/16/15, at 44-45, 102-03. Mother also failed to follow through on services to teach her to support D.Z.C., her autistic son. *Id.* at 79-80. Also, Mother resumed contact with M.W.B. even after he had a criminal assault charge filed against him and a PFA issued against him based on his abuse of his new girlfriend. N.T Hearing, 6/11/15, at 18; N.T. Hearing, 6/16/15, at 81-82. Mother permitted M.W.B. to visit her and to bring her supplies such as diapers for the Children. *Id.*

Mother remained at 1009 16th Avenue until the completion of the instant TPR proceedings, but that residence never was safe enough for the Children to move in. Investigations revealed several safety issues, including

loose floorboards in the Children's bedroom. N.T. Hearing, 6/11/15, at 9-10, 29-30. Mother never resolved that issue. *Id.* Investigations also revealed that Mother failed to keep the residence clean. Clothes and garbage piled up and investigators reported foul odors. *Id.* at 11; N.T. Hearing, 3/31/15, at 68-70. Mother's delinquency on her electric bills resulted in her losing power from May 12 to May 27, 2015, during which time the food in her refrigerator spoiled. N.T. Hearing, 6/11/15, at 6-7. After power was restored, investigators reported that the refrigerator needed a thorough cleaning and a broken window needed repaired. *Id.* Mother's residence also had an infestation of fruit flies. N.T. Hearing, 3/31/15, at 69. At least one scheduled visit with the Children had to be moved to another location because of the infestation. N.T. Hearing, 4/19/15, at 119.

Mother's financial situation also is insecure. She has no job and no income other than social security that she receives due to a learning disability. Mother has difficulty with numbers and corresponding difficulty with managing her finances. Attempts to help mother sort out her finances were unsuccessful. N.T. Hearing, 3/31/15, at 81-82. Mother tested positive for marijuana on March 27, 2015, despite her repeated denials of marijuana use. N.T. Hearing, 3/31/15, at 67. Mother also tested positive for marijuana use in April and May of 2015. N.T. Hearing, 6/11/15, at 22.

At the trial court's direction, the agency scheduled increased visits—normally twice per week—between Mother and the Children in 2015. The

visits were partially supervised, and the supervisors expressed concerns about Mother's ability to interact with the Children alone. N.T. Hearing, 3/31/15, at 33-34. In particular, Mother did not consistently recognize safety risks—on one occasion, for example, she attempted to blow dry the Children's hair while they were in a bath tub full of water—to the satisfaction of the visitation supervisors. *Id.* at 72-73. The increased visits also seemed to be a strain for the Children. During the increased visitation schedule, D.Z.C. exhibited an increase in stuttering, humming, rocking back and forth, and biting himself. *Id.* at 54-56. Mother did not use suggested methods to limit such behavior. *Id.* T.M.B. became increasingly negative during the visits. *Id.* at 56. The supervisor believed T.M.B. succeeded in getting more of Mother's attention when he misbehaved. *Id.* Mother never progressed to unsupervised visits or overnight visits. *Id.* at 34-36.

CYF filed its second TPR petition on March 11, 2015. The trial court conducted hearings on April 9, 2015, June 11, 2015, and June 16, 2015. In orders and decrees dated August 12, 2015 and August 24, 2015, the trial court terminated Mother's parental rights and changed the Children's permanency goal to adoption. This timely appeal followed.

Mother raises three issues for our review:

> A. Whether or not the trial court erred in terminating Mother's parental rights to [Children] under 23 Pa.C.S.A. § 2511(a)(2) and (8)?

> B. Whether or not the trial court erred in terminating Mother's parental rights under [23 Pa.C.S.A. § 2511(b)]?

- 6 -

C.      Whether or not the trial court erred in changing the goal to adoption?

Mother's Brief at 17.

Our standard of review is as follows:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights.  As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion.  Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re S.P.*, 47 A.3d 817, 826 (Pa. 2012).

The trial court terminated Mother's parental rights under § 2511(a)(2) and (8).  We need only affirm under one subsection of § 2511(a).  *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2012).  In this case we will rely on § 2511(a)(8), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> [. . .]

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

The party seeking termination under § 2511(a)(8) must prove the following by clear and convincing evidence: "(1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *Z.P.* 994 A.2d at 1118 (quoting *In re M.E.P.,* 825 A.2d 1266, 1275–76 (Pa. Super. 2003)) Further, "[t]ermination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." *Id.* "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re A.L.D.*, 797 A.2d 326, 336 (Pa. Super. 2002).

In support of its decision to terminate Mother's parental rights, the trial court offered the following observations:

> 1. [Mother] lost consistency in her meetings with [Family Intervention Crisis Services], began avoiding FICS workers and had 'no shows' as well as losing all contact with FICS and the foster family during the period of time that she actually had increased time with the boys.
>
> 2. [Mother] struggled with stress and feeling overwhelmed when the visits increased to the extent she found it necessary to use marijuana to assist her ability to cope.

3. [Mother] found it difficult to have consistency with individual counseling which she and all others agreed is critical to any safe and healthier emotional functioning due to her past traumatic childhood and adult years. ]

4. [Mother] could not complete the FICS nurturing/parenting group despite the fact she had transportation offered and available.

5. [Mother] could not keep her utilities current nor did she reach out to others to alert them or ask for assistance when the termination occurred.

6. [Mother] struggled to manage her ARD program which resulted in a bench warrant and [Mother's] efforts to go 'underground' that created concern for [CYF], FICS and the foster parents when her complete silence occurred for days.

7. [Mother] failed to attend her psychiatric assessment without any reasonable explanation and also failed to build support for herself outside the [CYF] system by applying for peer support services.

8. [Mother] failed to complete or follow through with medical transportation services (MTAP) over several months despite her understanding that if or when the boys would return she would need help with transportation beyond the FICS or Blair Foundation workers.

9. [Mother] missed medical appointments and failed to follow through with her needed serious dental work which would have removed the difficult and logistical coordination of those matters upon any return of the boys.

Trial Court Opinion, 8/12/15, at 6-7. The trial court went on to summarize these nine observations:

Even without all the other facts relating to [Mother's] ability or inability to retain parenting prompts, prevent fruit flies infestations, negotiate effectively with the landlord for housing safety, bathe, cook or discipline the boys, these above-

enumerated factors alone create the clear and convincing evidence that the conditions leading to placement have not changed and cannot be remedied by [Mother].

*Id.* at 7.

We have conducted our own review of the record, summarized above, and we conclude the record supports the trial court's findings. The Children have not been in Mother's care since May 5, 2013. Thus, the first of the three prongs of § 2511(a)(8) analysis is not in dispute. Mother has never found suitable housing for herself and the Children. The record indicates her current home frequently is dirty, fruit fly infested, and unsafe. After the trial court denied CYF's first TPR petition and increased Mother's visits with the Children, Mother failed to make progress toward addressing the conditions that led to placement. In addition to the housing issues, Mother has been inconsistent in her cooperation with various service providers and has resorted to marijuana use to cope with stress. Also, she has failed to comply with the terms of her ARD imposed on for her endangering the welfare of children offense. In addition, Mother has exhibited a lack of awareness of potential safety hazards during her interaction with the Children. Thus, the record supports the trial court's findings that the conditions that led to the Children's placement continue to exist, and that termination of Mother's rights would best serve their needs and welfare.

Mother argues the trial court erred because the record contains no evidence that she is a threat to the Children's safety based on Mother's

analysis of a child safety guide published by the American Bar Association and Action for Child Protection, Inc. Mother's Brief at 28. Mother asserts she is able to perform basic parental duties, that her apartment has not been cited for a code violation, despite FICS' concern with the structural integrity of the floor in the Children's room. Mother also notes that she has never been violent towards the Children and that none of them has sustained a serious injury while in her care. Mother claims she has not rejected services, but rather is frustrated by what Mother believes are unrealistic expectations.

Mother's arguments about the sufficiency of her apartment are contrary to the evidence of record and to the trial court's findings. We are glad Mother has not subjected the Children to any violence, but that fact is not sufficient to defeat a TPR petition. Similarly, the absence of any serious injury to the Children while under Mother's supervision does not preclude a finding that termination of her parental rights will best serve the Children's needs and welfare. In summary, the facts of record support the trial court's findings, and we discern no error in the trial court's conclusion that termination of Mother's parental rights is appropriate under § 2511(a)(8).

We now consider whether termination is appropriate under § 2511(b):

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re C.D.R.*, 111 A.3d 1212, 1215 (Pa. Super. 2015) (*quoting* *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* at 1219.

The trial court found the Children are thriving in their foster home, where they have been living for two years. As noted above, the Children's behavior declined in response to increased visits with Mother. During meetings, the Children would say hurtful things to Mother and complain about the condition of her apartment. N.T. Hearing, 6/11/15, at 20, 50-52. The caseworker acknowledged that Mother showed exemplary patience in response to the Children's behavior. *Id.* at 19-20. Nonetheless, as of May 1, 2015, the visits occurred either in the foster home or at an FICS office,

because the condition of Mother's apartment continued to decline and he electricity was turned off. *Id.* at 6-7. When the frequency of visits lessened, the Children's behavior improved. *Id.* at 20-21, 26. The Children seemed "happier" and "more relaxed" after the visits decreased. *Id.* at 53.

D.Z.C., the oldest child, was five years old when he was removed from Mother's home. Prior to placement, he was not toilet trained or able to eat with utensils. Also, he was afraid to take baths. The foster family was able to resolve those issues. N.T. Hearing, 10/7/14, at 19-20. The foster family has been consistent in providing a stable physical and emotional environment, and the Children's growth and development in placement has been significant. N.T. Hearing, 9/24/14, at 26.

The trial court acknowledged that the Children love Mother and Mother loves them, but Mother, after more than two years of services, has been unable to provide for the Children's developmental, physical and emotional needs on any consistent basis. Increased interaction between Mother and Children after denial of the first TPR petition proved to be emotionally difficult for the Children. We discern no error in the trial court's finding that termination of Mother's parental rights was appropriate under § 2511(b).[3]

_____

[3] The trial court noted that the foster family was open to continued visits between Mother and the Children, such that termination of Mother's parental rights will not entirely sever the bond between Mother and Children. Trial Court Opinion, 8/12/15, at 10. Recently, in *In re G.L.L.*, 124 A.3d 344, 348 (Pa. Super. 2015), this Court noted that the potential for open adoption is

*(Footnote Continued Next Page)*

For her third argument, Mother asserts the trial court erred in changing the Children's goal to adoption. Mother argues the Children's permanency goal should be permanent legal guardianship without termination of Mother's parental rights. Given our decision to affirm the decree terminating Mother's parental rights, this issue is moot.[4]

In any event, we discern no error in the trial court's goal change order. "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." **M.T.**, 101 A.3d at 1173. CYF bears the burden of proving a goal change is in the Children's best interests. All of our analysis of Mother's first two arguments demonstrates why a goal change is in the Children's best interests. Further, Mother's legal support for her argument rests solely on a footnote in **In re I.G.**, 939 A.2d 950 (Pa. Super. 2007). There this Court **suggested**

> consideration of permanent legal custody in paternal aunt, which would not lead to termination of Father's parental rights, in particular since the record indicates that paternal aunt would

_(Footnote Continued)_ ─────────────

not an appropriate or relevant consideration under § 2511(b). We do not believe a possible open adoption was a deciding factor in the trial court's analysis. As explained in the main text, a substantial body of evidence supports the trial court's decision to terminated Mother's parental rights under § 2511(b).

[4] We note that a change of permanency goal from unification to adoption was not a prerequisite for terminating Mother's rights. **In re M.T.**, 101 A.3d 1163, 1166 (Pa. Super. 2014) (_en banc_).

- 14 -

be willing for the children to have a relationship with Father and that Father and paternal aunt have a good relationship.

*Id.* at 957 n.9. Mother believes permanent legal guardianship is a better option here because the foster family would not guarantee that D.Z.C. would remain in public school rather than private school. Mother believes D.Z.C., given his autism, would fare better in a public school equipped to handle D.Z.C.'s condition. Mother cites no law or evidence to support this proposition, and the only supporting law she cites comes from a suggestion of this Court in a case with its own distinct facts. Mother is not entitled to relief on her third argument.

In summary, we have concluded that the trial court did not err in terminating Mother's parental rights and changing the Children's goal to adoption. We therefore affirm the orders and decrees on appeal.

Orders and decrees affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/19/2016

- 15 -