J-S28032-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: E.L., III, A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.L., JR., NATURAL FATHER | No. 17 MDA 2015 |

Appeal from the Order Entered November 19, 2014
In the Court of Common Pleas of Wyoming County
Civil Division at No(s): OCAD #2014-10

*****

| | |
|---|---|
| IN THE INTEREST OF: J.J.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.L., JR., FATHER | No. 18 MDA 2015 |

Appeal from the Order Entered November 19, 2014
In the Court of Common Pleas of Wyoming County
Civil Division at No(s): OCAD #2014-11

*****

| | |
|---|---|
| IN THE INTEREST OF: D.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.L., FATHER | No. 19 MDA 2015 |

Appeal from the Order Entered November 19, 2014
In the Court of Common Pleas of Wyoming County
Civil Division at No(s): OCAD #2014-12

| IN THE INTEREST OF: T.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: E.L., JR., FATHER | No. 20 MDA 2015 |

Appeal from the Order Entered November 19, 2014
In the Court of Common Pleas of Wyoming County
Civil Division at No(s): OCAD #2014-13

BEFORE: BOWES, J., ALLEN, J., and LAZARUS, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 02, 2015**

E.L., Jr. ("Father") appeals from the orders entered in the Court of Common Pleas of Wyoming County involuntarily terminating his parental rights to his four sons, E.L., III (DOB March 2007), J.J.L (DOB June 2008), D.L. (DOB November 2009), and T.L. (DOB August 2010) (collectively, "Children"). After our considered review, we reverse. Wyoming County Children and Youth Services (CYS), a division of Wyoming County Human Services, has failed to meet its burden of proving by clear and convincing evidence that Father's parental rights should be terminated under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Father raises thirteen claims on appeal, several of which overlap, and so we summarize for ease of addressing them as follows:

Did the trial court err in failing to consider:

1. that the alleged conditions giving rise to the petition were capable of and subject to remedy within a reasonable period of time or no longer existed, that Father has the means of

- 2 -

correcting any alleged basis for termination, and the lack of testimony that father would not be capable of caring for his children post-incarceration?

2. Father's efforts in attempting to arrange visitation through the agency, which efforts were ignored and thwarted by the agency?

3. Father's conduct in providing for his children prior to incarceration as indicative of his ability to maintain parental responsibilities?

4. how termination of Father's parental right would affect the developmental, physical and emotional needs of the children?

Father was incarcerated in 2011; he was convicted of possession of a firearm without a license.[1] At the time of the termination hearings, in October and November 2014, Father was already transitioning back to society, living in a halfway house.

Prior to 2011, Children lived with Father and natural Mother, H.M., ("Mother"), as well as K.A.P., Jr.,[2] Mother's oldest child from another man. In November 2012, while Father was incarcerated, CYS received a referral that the two oldest children were not enrolled in school and that there were concerns for Children's health and well-being in the home. As a result, in

_____

[1] Father was found carrying a disassembled antique pistol in a plastic bag in his car; he was sentenced to three years' imprisonment. N.T. Hearing, 10/24/14, at 64.

[2] K.A.P., Jr. is the subject of a separate termination proceeding, which is also currently on appeal. *See* 16 MDA 2015, J. S28031/15.

December 2012, Children were removed from Mother's home by CYS.[3]
Children have been in the custody of CYS since 2012; Children, along with
their half-brother, K.A.P., Jr., have been in the care of F.S. and R.S.,
("Foster Parents"), since the summer of 2013.

The court granted a goal change to adoption on January 13, 2014.
Father was released from his incarceration one week later, on January 21,
2014. Foster Parents are prospective adoptive parents; they wish to adopt
all four boys, as well as K.A.P., Jr. CYS filed petitions for involuntary
termination of Father's parental rights with respect to Children on August 22,
2014.[4]

_____

[3] Mother signed a Consent to Adopt with respect to all of the children. **See**
Order of President Judge Russell D. Shurtleff, 1/7/15:

> And now, this 7th day of January, 2015, after hearing on
> October 24, [2014] to Involuntary [sic] Terminate the Parental
> Rights of the above-referenced children during which Mother was
> represented by Joseph McGraw, Esquire [], review of the
> transcript thereof and the Court finding the Natural Mother,
> [H.M.], knowingly, voluntarily and intelligently executed a
> Consent to Adopt, of which judicial notice was taken during the
> hearing and the Consent to Adopt was confirmed by this Court
> during said hearing, IT IS HEREBY ORDERED that Natural
> Mother's Consent to Adopt is CONFIRMED.

[4] We note that each of the four petitions are identically worded to the
petition filed regarding K.A.P., Jr., (16 MDA 2015, J. S28031/15), even to
the extent of using the name K.A.P., Jr., instead of Children's names at issue
here. Each of the four petitions before us read: "Wyoming County Human
Services, shall continue to assume legal custody of [K.A.P., Jr.] until such
time as the child is adopted." **See** Petitions for Involuntary Termination,
8/22/14, at ¶ 13. Clearly, this is a "cut and paste" error.

Father is a high school graduate. Prior to his incarceration, he worked as the Seafood Manager at a Price Chopper grocery store in Dunmore for twenty years, and he held construction jobs on the side. He was continuously employed for a period of thirty years, and during that period had no problems with police and had never been incarcerated. N.T. Hearing, 10/23/14, at 65-67. Father testified that he was involved in Children's daily activities, took them to school, and attended holiday events at their school. *Id*. at 68. Father also testified as to his own upbringing; his father was a military drill sergeant and his mother was a nurse, and his family moved every three years because of his father's position in the military. *Id*. at 69.

Father stated that during his first year of incarceration, Mother brought Children to visit him each week. After that time, they began living with Mother's friends (Foster Parents), and despite his attempts, he was unable to communicate with Children. *Id*. at 70. Father testified regarding his attempts to arrange visits with Children during his incarceration as follows:

> A: . . . I wrote letters out to the caseworker. She said I couldn't write the kids personally. I could send a letter to her so [ ] in the letter, said I'm right down the street from where you live. I know where you live. Why can't you bring my sons to see me? I know they need to see their dad. Two years, and I was [inaudible] with them all the time, and that broke my heart. . . . Now I'm out, and I get a letter in the mail telling me they want me to sign my rights over. She [Foster Mother] wanted to be the one to raise my sons, and it's killing me on the inside, too. I'm trying to get my life together now. I'm trying to move back to Scranton and everything and get my sons and raise them the right way.

*Id*. at 70-71.   With regard to the CYS caseworker's attempts to arrange Children's visits with Father, Father stated: "She told me - she said well, first, I got to check it out and see if the kids really want to see you.   Then, she would tell me, let me talk to my director, my boss.   I'll get back to you, and never got back with me." *Id*. at 71.     Father testified that he was distraught over not being able to see his children:

> A: I just want to-I wanted to cry.  I feel like I was left behind. . . to try to get everything taken care of, you know.  I started talking to people, talking to lawyers, told me the right steps to take.

*Id*.   Father's testimony continued, stating that he wanted to be involved with his son, he wanted to "raise" them and "give them the love that they need." *Id*. at 73.   He also testified that that up until the time of his incarceration, he was a hands-on parent:

> Q: And was that on a daily basis?
>
> A: Every day.  Every day.
>
> Q: And did you share meals with them?
>
> A: Oh, in the morning time, we would sit at the breakfast table and we'd say a prayer. We'd thank God for our meal. Lunchtime, dinnertime, every time, they'd say dad, don't forget to say the prayer.  That's the way I was brought up and I brought my kids up the same way.
>
> * * * *
>
> Q: Prior to your incarceration, [was] there ever any involvement of any social service agencies, Children and Youth or anything, about your ability to care for your children?
>
> A: No. No, sir.
>
> * * * *

Q: Now, were you ever - was there ever any allegations of violence or anything like that within your household?

A: No, no, no.

*Id*. at 74-76.

Father testified that he wanted to reestablish contact with his children and that he had taken the recommended parenting class. He also testified that he did not use any illegal drugs. ***Id***. Father agreed that Foster Mother was a "good person," *id*. at 77, but believed he had the capacity to parent Children:

Q: Do you think you have the capacity to be a father to these children?

A: Yes, I do. . . . I know it in my heart.

Q: What are your goals for your children?

A: My goals for my kids, I want my kids to be raised up proper. I want them to respect everybody they meet . . . . Don't judge no book by its cover. I want them to be somebody. I want them to tell me what they want to be and encourage them. I want to father them, you know. I want to see my kids grow up and become [men] and have kids. I want to see them graduate high school, you know? I want to see all of this. I['ve] seen the first steps. I want to see the graduation, too. I want to be inside their life.

Q: How long do you think it would take you to establish a residence and employment in Lackawanna County or Scranton area?

A: This area? . . . I can't guarantee time, but thirty to – thirty days – thirty to sixty days tops. Something nice, fully furnished, and everything they['re] going to need. It's a lot of work to do.

*Id*. at 70-82.

- 7 -

Father also testified that he wanted to continue Children's relationship with K.A.P., Jr.. He explained that he had told K.A.P., Jr. that he was the "big brother." *Id*. at 82.

On cross-examination, counsel questioned how often Father wrote letters to Children. Father replied that he wrote to "all five boys," including K.A.P., Jr., and that he wrote every week. *Id*. at 82. Father stated that he gave the letters to his caseworker, Miss Ryan, and she distributed the letters to the boys. *Id*. He also stated that if Mother wanted to be involved he had no problem with that and would not keep his sons from their mother. *Id*.

Q: Understood, but you want to have them in your -

A: In my custody, yes, in my custody.

Q: The four of them?

A: Sir?

Q: The four children - the four boys.

A: I'd love to have five, but— I'd love to have all of them. I would love to, but they say that he's not really my son, but I would love to have all five of them. They all love me.

Q: And you indicated that you would be out from the parole house in the next two weeks.

A: Yes[.] . . .

Q: And at any point after you were released from SCI Dallas back in January and before you learned of this, the attempt by the agency to terminate your parental rights, during that six month period, did you try to contact— . . . Before you learned about that and you were released from—in January from SCI Dallas, did you make any effort to contact the agency?

A: Yes, I contacted the agency and I'm trying to get visitation rights, and they told me they needed to talk to the kids first or they needed to talk to her boss, the director or whatever, and that I would get back with you later. . . . That's exact words.

Q: You mentioned you were incarcerated in February 2011. The children weren't put into placement . . . until December of 2012. Did you see - did you see the children between February of 2011 and December of 2012?

A: I must say yes. She [Mother] brought the kids every weekend to see me and visit me. Every last one of them, she brought to visit me.

Q: And were you living with [Mother] up to the date of your imprisonment in February of 2011?

A: Yes.

Q: So all six of you were living under the same roof?

A: Correct, yes.

Q: The job that you mentioned that you're looking forward to in Scranton, what type of position is that?

A: It's in construction. I do all type[s] of construction, dry wall, . . . I can do it all, and my friend, he owns his own company, I can work for him. Since I lived in Scranton, we built his house. He do[es] exquisite work.

Q: When did you - you have experience in that field?

A: Yes, I do.

Q: And when was the last time you actively worked in the construction field?

A: Probably like a couple months ago, we did some work up in Clarks Summit.

Q: OK, and so before you were incarcerated, did you work in the construction industry?

A: Yes, I worked with him and I also worked in my hometown, Atlanta, Georgia. I was a brick, block, concrete layer, finisher.

Q: And has he indicated to you what kind of salary you could expect?

A: He was paying me like by the job so I'm guaranteed five or more a week, depend on what the job is, you know. . . . . depends on the job, some jobs cost more.

Q: So if he doesn't work, you don't work, correct?

A: Oh, he always got work. . . .

Q: And have you started looking for housing in Scranton?

A: Not yet, but my friend own houses in Scranton. He owns . . . like five or six houses in Scranton and Dunmore. . . .

* * * *

Q: Is this the same friend that's going to employ you?

A: Yeah, that's right.

* * * *

Q: And the last time you saw the four boys?

A: . . . I've been out almost ten months, almost three years now haven't seen my boys[.] . . .

Q: Have you had any discussions with any of the [foster] family?

A: Nope.

Q: Have you tried to reach out to them?

A: I reached out through Children and Youth, and the words that was told to me is they don't have to talk to me if they don't want to.

Q: And do you believe you can offer the four boys a better life than what they have right now?

A: Yes, I can.

*Id*. at 83-87.

During the hearing, counsel for K.A.P., Jr., Children's half-brother, also questioned Father:

Q: Despite what happens, do you think knowing the children, all five children, do you think it's best that they all remain together?

A: Well, it all depends. I love all five of the boys as my sons. If I can't have [K.A.P., Jr.], I would still love to have my sons. I would still like to spend time with him and I would make sure my sons get to see him, and he will always be treated like family through my heart. He is my son, too.

Q: So would they all - I guess my question is more, do they have a close relationship- does [K.A.P., Jr.] have a close relationship as best as you recall with the other children?

A: Yes, he do[es]. He only knows that he's the oldest brother. . . He's big brother.

*Id.* at 82-88. On re-direct, Father clarified that while he worked at the grocery store, he also worked construction on the side, stating,

I go to work - I go to work sometimes 3:00 in the evening and stay til the store close[s]. I love money, and when you got a big family, two vehicles- two vehicle, big family, you need a lot of money.

*Id.* at 90-91.

The CYS caseworker in this case, Meagan Manning, also testified. She stated that she has been involved in this case since December of 2012. N.T. Hearing, 11/10/14, at 5. She also testified that Father's testimony that he wrote to the boys every week was not accurate. To her recollection,

- 11 -

Father wrote to the boys three times since 2012. *Id*. at 40-41.[5] Manning also acknowledged that Father contacted her after his release:

> On February 19th, [Father] had called me and we did have a discussion about his whereabouts and what his intent[ions] were for the future of the case. . . . He said he was at the Allentown CCC (halfway house). . . he stated that he would like visitation, but he would need time to secure the funds to come from Allentown to Tunkhannock. I'd said that I was going to have a conversation with the kids regarding if they had an interest in meeting with [Father], and that [he] should contact me back when he had the appropriate funds that were needed.

*Id*. at 44-45.

Thereafter, Manning stated she heard nothing from Father. The phone numbers she had for him had been disconnected, so she sent a letter on April 23, 2014, to Father at the Allentown CCC; that letter was sent back to her, on May 5, 2014, as undeliverable. *Id.* at 47. Manning further stated that after her letter of April 23, 2014 was returned, she continued efforts to contact Father. She stated that she contacted the agency's paralegal, who attempted to locate Father. *Id.* at 49. Manning also disputed Father's testimony that there was no violence in the home, as there were allegations of domestic violence by Father against Mother, but she stated that she was not able to release the referral source for those alleged incidents. *Id.* at 55-56.

---

[5] We note that Father testified he gave his letters to Ms. Ryan, his caseworker. Ryan did not testify at the hearing. It appears caseworker Manning took over once Children were removed from natural Mother.

- 12 -

On cross-examination, however, Manning acknowledged that after she sent the April 2014 letter, she knew Father had been moved to Coleman Hall in Philadelphia, that she sent no letters to Coleman Hall, and that none of her letters was copied to Father's counsel, who was appointed in December of 2013. *Id*. at 62-63.

Manning's testimony on cross-examination continued:

Q: And was there not – let's talk about visitation for one minute here. **Did not [Father], when he was at SCI Dallas, request visitation?**

A: **Yes**.

Q: And in fact, did you not agree you would arrange to - for visitation with [Father] while he was incarcerated?

A: Yes.

Q: And, in fact, did you make those arrangements?

A: No.

Q: **And, in fact, did you ever follow through on his stated intent for visitation during his time in his incarceration?**

A: **No.**

Q: **And did you ever follow up with him while he was either in Allentown or in Philadelphia in further attempts to arrange visitation which had failed because it was never arranged?**

A: Regarding when he was incarcerated?

Q: Yes.

A: **No**.

Q: And while he was at - I'm not using the word incarceration for both the Allentown CCC and the Coleman Hall, which is a CCC in Philadelphia. Did you ever attempt to revisit the visitation after it was not scheduled as you promised?

A: Yes.

Q: And was it arranged?

A: It was attempted, yes.

Q: Was it arranged?

A: No, it never occurred.

Q: Did [Father] ever voice any objection to visitation?

A: No.

* * * *

Q: Now, [Father] indicated that in addition to his employment record, that he had been an active father up until the time of his incarceration.

A: Yes.

Q: **Do you have any records that would dispute the fact that he was a live-in father.**

A: **I do not.**

Q: So you would agree with me that the records would support his testimony in that regard?

A: Yes.

* * * *

Q: Was [Father] consistent or inconsistent in the desc- in the alleged offense and the repercussion of the alleged offense?

A: Consistent.

Q: How long was [Father] at Coleman Hall if you know? Coleman Hall being the Philadelphia facility?

A: I don't - I don't know.

Q: But regardless of how long he was there, you never attempted to contact him there.

A: Personally, no. . .

Q: **Do you know – can you testify for sure that anyone made efforts to contact him at Coleman Hall?**

A: **I can't. I know I received a phone call from him, but I did not write him a letter when he was in Coleman Hall.**

* * * *

Q: [Father] testified at [the] hearing that he is in the process of seeking a transfer from the CCC in Allentown to a location in Scranton, Pennsylvania. Do you have anything in your records that would dispute that?

A: No.

Q: **When [Father] resided in Scranton, did he reside in private housing?**

A: **To my knowledge, yes.**

Q: And when he was residing in Scranton, who provided for his family, food, clothing, and shelter?

A: I'm not sure. I know he testified that he was employed. . . .

* * * *

Q: **When the caseworker appeared, would I be correct that she observed the home to be in satisfactory condition?**

A: **Yes**.

Q: **That the food supply was excellent?**

A: **Yes**.

Q: **That the children's physical appearance and observable medical conditions were excellent?**

A: **Yes**.

Q: That the caregiver's physical appearance and observable medical conditions were satisfactory?

A: Yes.

Q: That when – **[Father] was involved at this point in time, correct?**

A: Yes.

Q: He would be the father, and that **family interactions at that time were quote, excellent, quote.**

A: **Yes, that's what it says.**

*Id*. at 66-87 (emphasis added).

Manning acknowledged on cross-examination that Father intended to reestablish a family residence in Scranton, and that there was no evidence to indicate that Father was not involved in the lives of Children up until the time of his incarceration *Id*. at 86-87.

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent.

> The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). Our scope of review is broad and comprehensive, although our standard of review is narrow. *See In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super.

2005). We consider all the evidence, along with the legal conclusions and factual findings of the trial court, and will reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support. ***Id***.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In this case, the trial court made several findings of fact, essentially mirroring the language of sections 2511(a)(2),[6] (a)(5)[7] and (a)(8).[8] ***See***

_____

[6] "The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S.A. § 2511(a)(2).

[7] "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and

*(Footnote Continued Next Page)*

Trial Court Order, 1/19/14, at 2-3.  The court concluded that CYS had proved  termination, under section 2511(a)(2), by clear and convincing evidence that "Father, through his course of conduct continuing for a period of over one (1) year, has failed to perform his parental duties and has caused the subject children to be without essential parental care, control or subsistence necessary for the subject children's physical and mental well being and the conditions and causes of the neglect and refusal cannot and will not be remedied by the natural Father." *Id*. at 4.  We disagree.

In order to terminate parental rights due to parental incapacity, abuse, neglect, or refusal, the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.  23 Pa.C.S.A. § 2511(a)(2).

_____
*(Footnote Continued)*

termination of the parental rights would best serve the needs and welfare of the child."  23 Pa.C.S.A. § 2511(a)(5).

[8] "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.  23 Pa.C.S.A. § 2511(a)(8).

Here, the first two elements pertaining to incapacity are based solely on Father's incarceration. In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the issue of relevance of incarceration in a section 2511(a)(2) termination case. The Court stated:

> [W]e now adopt the view of other Superior Court panels that have determined that incarceration neither compels nor precludes termination. . . . Instead, we hold that incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence **and** that the causes of the incapacity cannot or will not be remedied.

*Id*. at 827 (quotations and citations omitted). The Court went on to state:

> In line with the expressed opinion of a majority of justices in *R.I.S.*, [36 A.3d 567 (Pa. 2011)], our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" **and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).** . . . If a court finds grounds for termination under subsection (a)(2), a court **must** determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, inter alia, how a parent's incarceration will factor into an assessment of the child's best interest.

*Id*. at 830 (emphasis added)(quotations and citations omitted).

- 19 -

Although the Court in *S.P.* found that this Court had erred in reversing the trial court's termination of father's parental rights, there, father had been incarcerated since prior to S.P.'s birth and had *never* provided the child with essential parental care. *Id*. at 332. Here, the testimony was uncontroverted that Father was an active parent, on a daily basis, up until the time of his incarceration, and that he had visits once a week with Children for the first year of his three-year incarceration. Father had no prior arrests, no PFAs, and no indications of abuse with respect to Children. There is no evidence of drug or alcohol issues, and there is no evidence pointing to violent or criminal behavior. There is every indication that Father has the willingness and capability to parent. Caseworker Manning acknowledged that Father requested visitation after Children were removed from Mother's care, but many of those requests were simply not "arranged."

Further, even accepting that Father's incarceration is determinative of his incapacity and that his incapacity has caused Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being, we cannot find that the record provides clear and convincing evidence that the cause of the incapacity (incarceration) cannot or will not be remedied.

The well-established requirement, that the evidence be clear and convincing in order to prove termination under section 2511(a), exists to further protect against government interference with the family relation and the values it serves. *Santosky v. Kramer*, 455 U.S. 745 (1982); *see also*

*In re William L.*, 383 A.2d 1228, 1240 (Pa. 1978); *In re P.S.S.C.*, 32 A.3d 1281 (Pa. Super. 2011); *In re Rinker*, 117 A.2d 780, 783 (Pa. Super. 1955) ("A family is an institution which preceded government.  Its sanctity was universally recognized before judges or statutes or constitutions or welfare organizations were known to man.").

Here, we are unable to conclude that any of the testimony was so clear, direct, weighty and convincing on this point as to enable the trier of fact to come to a clear conviction, without hesitation, that Father will be incapable of parenting Children.  *See In re I.G.*, 939 A.2d 950, 951 (Pa. Super. 2007) ("Where an incarcerated parent faces termination of parental rights, it is critical that the fact of incarceration and the practical limits it imposes on the parent/child relationship not obscure the focus of the statutory inquiry.").  *Cf. In re D.C.D.*. 105 A.3d 662 (Pa. 2014) (trial court did not abuse its discretion in determining  father was incapable of providing care for child and that incapacity would exist at least until father's minimum release date of 2018 when the child would be seven years of age and where there was absence of bond between father and child).

We reiterate that Father is no longer incarcerated; at the time of the hearing he was in a halfway house and expected to transition to a home and a job within the next few months.   Father's testimony establishes that he is both willing and able to transition to reunification:

Q: Where are you residing now?

A: I'm in the Allentown CCC center in Allentown.

Q: And for how long are you going to be there?

A: I'll probably by there for another two weeks and then I'm moving to Scranton.

Q: Is it your intent- is your intent to move to Scranton to be near your children -

A: Yes.

Q: - or for other reasons?

A: Yes, I also have a job with my friend. He owns a construction company. I've been doing it for like twenty years, and he said, he can help me get a place to live, and he also- I got a job. You know, so, that's where I'm at.

Q: Do you love your children?

A: I love them with all my heart.

N.T. Hearing, *supra* at 72.

The evidence shows that Father was a hands-on parent prior to his 3-year incarceration and that he worked steadily for thirty years. The evidence also shows that Children were removed from Mother's care when Father was incarcerated, and that Mother brought Children to visit Father every weekend of his first year of incarceration, but that these visits stopped once Children were removed from Mother's care and placed in the care of Foster Parents. Further, the evidence shows that Father requested visitation, and that although CYS acknowledged Father's requests, it did not follow through or "arrange" visitation while Father was incarcerated. Our review of the record indicates that CYS has not proven by clear and convincing evidence that Father's incapacity "cannot or will not be

remedied." 23 Pa.C.S.A. § 2511(a)(2). This is not a question of credibility, but rather one of insufficient evidence.[9]

Additionally, we find that the trial court erred when, after finding termination under section 2511(a)(2), it failed to engage in any discussion with respect to section 2511(b). **See** 23 Pa.C.S.A. § 2511(b) ("The court in terminating the rights of a parent **shall** give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.") (emphasis added). Where, as here, the court determined termination was warranted under subsection (a), it was required to go on to a needs and welfare analysis under subsection 2511(b). **See L.M.**, **supra**. Under subsection (b), the court's focus is not on the parent's conduct, but on the children and their needs. "This analysis includes weighing the needs and welfare of the child, as well as an examination of the emotional bond between parent and child. **In re: D.W.**, 856 A.2d 1231, 1234 (Pa. Super. 2004). This "encompasses intangibles such as love, comfort, security, and stability." **In re Adoption of R.J.S.**, 901 A.2d 502, 514 (Pa. Super. 2006).

---

[9] We note that the trial court's management of this case has complicated our appellate review. Father's circumstances here are significantly different from those of the father in K.A.P., Jr.'s case., but it appears the court combined the hearings and conflated the issues. **See** footnote 4, **supra**.

Here, the court states in its opinion that "termination of parental rights would best serve the needs and welfare of the children[,]" but provides no discussion or analysis to support this statement. *See* Trial Court Opinion, *supra* at 3. "A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa. Super. 2008). "The court should examine intangibles such as "love, comfort, security, and stability" when determining the needs and welfare of the child." *Id*. *See also I.G.*, 939 A.2d at 951 ("the subsection (b) evaluation must be given more than mere lip service.").

Further, as noted in our decision, the court failed to engage in a section 2511(b) analysis. Termination is controlled by statute and requires a two-step analysis. Where, as here, the trial court determined Father's conduct warranted termination of his parental rights under section 2511(a), the court was required to engage in the second part of the analysis under section 2511(b).

As noted above, one major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, "with close attention paid to the effect on the child of permanently severing any such bond." *L.M.*, 923 A.2d at 511. CYS presented no evidence on this issue, and the court made no mention of any bond between Children and Father. This is not a case where we can assume no bond

existed, especially in light of Father's unrefuted testimony that there was a bond between him and Children.

In light of the above, we are constrained to reverse.[10]

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/2/2015

---

[10] We are not unmindful, however, of the bonds that have developed between Children and their half-sibling, K.A.P., Jr.  We confront a vicious cycle when CYS does not "follow through" when an incarcerated parent affirmatively seeks visits and communication with his children.  The parent/child bond is diluted, and the bond the child may have with foster parents and, like here, a half-sibling in the same foster home, is strengthened.  Although CYS may have believed it was best to keep these children together and that the foster parents could provide a better life for them, that is not the standard.  Our focus is on Father, on his actions or inactions, and whether CYS has proved grounds for termination by clear and convincing evidence. We cannot lose sight of the focus of the statutory inquiry.  **In re I.G**., **supra**.  We do recognize, however, that it may be in the best interest of Children if the sibling bonds, which were formed prior to Children's and K.A.P., Jr.'s placement, could be maintained.  Because CYS will be involved in the reunification process in this case, we suggest that it consider the history and relationship Children have with K.A.P., Jr.