J-S05016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: ADOPTION OF: A.M., MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.P., MOTHER, | |
| Appellant | No. 1187 MDA 2015 |

Appeal from the Decree Entered June 10, 2015
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 91 Adoptions 2014

| IN RE: ADOPTION OF: A.M., MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.P., MOTHER, | |
| Appellant | No. 1188 MDA 2015 |

Appeal from the Decree Entered June 10, 2015
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 89 Adoptions 2014

| IN RE: ADOPTION OF: J.M., MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.P., MOTHER, | |
| Appellant | No. 1189 MDA 2015 |

Appeal from the Decree Entered June 10, 2015

J-S05016-16

In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 90 Adoptions 2014

BEFORE: BENDER, P.J.E., SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED FEBRUARY 12, 2016**

Appellant, M.P. ("Mother"), appeals from the decrees dated June 9, 2015, and entered on June 10, 2015, granting the petitions filed by the Cumberland County Children and Youth Services ("CYS") to involuntarily terminate her parental rights to her children, Am.M., a daughter born in December of 2011, J.M., a son born in October of 2012, and Av.M., a daughter born in January of 2014 (collectively "the Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2) and (b).[1, 2] We affirm.

The trial court set forth the extensive history of this case in its Pa.R.A.P. 1925(a) opinion, which we adopt for purposes of this appeal. Trial Court Opinion, 9/2/15, at 1-9. On July 9, 2015, after the trial court

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although CYS sought the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b), the trial court specifically indicated that it found clear and convincing evidence to involuntarily terminate Mother's parental rights to the Children under 23 Pa.C.S. § 2511(a)(2), and that termination of parental rights was in the best interest of the Children under 23 Pa.C.S. § 2511(b).

[2] In separate decrees dated June 9, 2015, and entered on June 10, 2015, the trial court terminated the parental rights of V.M., Jr., the natural father of Am.M. and J.M.; and the parental rights of S.W., the alleged father of Av.M. or any other unknown father of Av.M. None of these men has filed an appeal, nor are they parties to the instant appeal.

- 2 -

terminated Mother's parental rights to the Children, Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following issues for our review:

> Did the Trial Court err as a matter of law and abuse its discretion in determining that [CYS] presented evidence so clear, direct, weighty, and convincing as to enable the fact finder to come to a clear conviction without hesitancy, of the truth of the precise facts in issue?
>
> Did the Trial Court err as a matter of law and abuse its discretion in determining the best interests of the [C]hildren would be served by terminating the parental rights of Mother, when the evidence indicated that the original reasons for placement of the [C]hildren no longer exist or had been substantially eliminated?

Mother's Brief at 4.[3]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if

_____

[3] Although Mother phrased her issues somewhat differently in her concise statement, we conclude that her issues are preserved for our review. In addition, in her concise statement, Mother challenged the change of the Children's goal to adoption. However, she has waived that issue on appeal by failing to include it in the statement of questions portion of her brief. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both the concise statement of errors complained of on appeal and the statement of questions involved in the brief on appeal).

they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re:*] *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, ___ Pa. ___, 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to

- 4 -

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As previously stated, in terminating Mother's parental rights, the trial court focused on 23 Pa.C.S. § 2511(a)(2) and (b). Trial Court Opinion, 9/2/15, at 1, 10. Section 2511(a)(2) and (b) provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but under section 2511(b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). For purposes of this appeal, we first analyze this case under subsection 2511(a)(2), then under subsection 2511(b), as did the trial court in its opinion dated on September 2, 2015.

Our Supreme Court set forth the proper inquiry under section 2511(a)(2) as follows:

> [Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> [The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> > A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

- 6 -

***In re Adoption of S.P.***, 47 A.3d at 827.

This Court has stated that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. ***Id***. at 340.

Here, the trial court properly assessed, at length, the evidence regarding Mother's repeated incapacity to parent the Children, and Mother's inability to remedy the conditions and causes of her incapacity to parent the Children. Trial Court Opinion, 9/2/15, at 9-12. The trial court found that the repeated and continued incapacity, abuse, neglect or refusal of Mother has caused the Children to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother.

Mother contends that the trial court abused its discretion and erred as a matter of law in terminating her parental rights when CYS failed to provide reasonable efforts to promote reunification of Mother and the Children prior to filing the termination petitions. Mother's Brief at 11-13. Our Supreme Court held, however, that the trial court is not required to consider reasonable efforts in relation to a decision to terminate parental rights under

section 2511(a)(2). *In the Interest of: D.C.D.*, 105 A.3d 662, 675 (Pa. 2014). Thus, we conclude that her argument lacks merit.

The facts as found by the trial court, nevertheless, support the determination that CYS did indeed make reasonable efforts to reunify the Children with Mother. The trial court stated the following:

> When Mother had the opportunity to better herself as a parent by attending the outpatient mental health counseling, intensive outpatient drug and alcohol counseling, and parenting courses required by CYS, Mother regularly cancelled or did not show up to her appointments, repeatedly resulting in her dismissal. When CYS sought to arrange transportation and set up visits with the Children at Tri-State for Mother's convenience, Mother was unreachable. Likewise, when Mother had the opportunity to give testimony before this [c]ourt as to why she is a fit parent, she once again was not present. Mother was given another opportunity to resume her full parental responsibilities of [J.M] and [Am.M.] when they were placed with Mother in May of 2014, yet Mother cared for them for just nine days before they, along with [Av.M.], were found dirty and hungry after being left at a hospital with a stranger.
>
> This Court believes that taking an active interest in the judicial process, cooperating with CYS, and working to reach the goals set in a service plan are all "necessary steps to supporting a parent-child relationship" where the children have been adjudicated as dependent, such as in the present case. *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008). After giving Mother a significant amount of time to meet these goals and better herself as a person and parent, this Court no longer believes that Mother is capable of remedying the incapacity and neglect which led to the Children's placement in September of 2013 and in June of 2014.

Trial Court Opinion, 9/2/15, at 11-12.

Although a reasonable-efforts inquiry is not an element of a termination decision under section 2511(a)(2), our review of the record

- 8 -

reflects that there is ample evidence to support a determination that CYS did make reasonable efforts to promote reunification of Mother with the Children. As the trial court's factual findings are supported by the record, and the trial court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to subsection (a)(2). *In re Adoption of S.P.*, 47 A.3d at 826-827. Therefore, we adopt the trial court's analysis as our own. Trial Court Opinion, 9/2/15, at 9-12.

Next, we review the termination of Mother's parental rights under 23 Pa.C.S. § 2511(b). Mother erroneously asserts that there was no testimony or evidence regarding the bond between Mother and the Children and, thus, that the trial court failed to properly conduct a bond analysis under Pa.C.S. § 2511(b).

Our Supreme Court recently stated the following:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

We have stated that, in conducting a bond analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has also observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). In addition, it is appropriate to consider a child's bond with their foster parents. *In re: T.S.M.*, 71 A.3d at 268.

Furthermore, in *In re: T.S.M.*, our Supreme Court set forth the process for evaluation of the existing bond between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home. The Supreme Court stated the following:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g.,* [*In the Interest of*] *R.J.T.*, 9 A.3d [1179,] 1190 [(Pa. 2010)] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage

that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. [The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.*, 9 A.3d at 1186; *In re Adoption of S.E.G.*, 901 A.2d [1017,] 1019 [(Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See*, 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

*In re: T.S.M.*, 71 A.3d at 268-269.

Here, the trial court considered the needs and welfare of the Children

and set forth a proper bond analysis, at length, which we adopt as our own.

*See* Trial Court Opinion, 9/2/15, at 12-13. Furthermore, we point out that

to the extent Mother suggests that there is some type of bond between her

- 11 -

and the Children that the trial court failed to properly consider, Mother did not appear for the hearing scheduled for May 12, 2015, where she was to provide testimony. *Id*. at 1-2.

Further, we stated in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.P.*, 994 A.2d at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004). Again, as the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to subsection 2511(b). *In re Adoption of S.P.*, 47 A.3d at 826-827. Accordingly, we affirm the trial court's decrees terminating Mother's parental rights.[4]

Decrees affirmed.

_____

[4] The parties are directed to attach the redacted copy of the trial court's opinion dated September 2, 2015, in the event of further proceedings in this matter.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/12/2016</u>

IN THE ADOPTION OF      : IN THE COURT OF COMMON PLEAS OF
AM████ M████,      : CUMBERLAND COUNTY, PENNSYLVANIA
     : ORPHANS COURT DIVISION
DOB: 12/██/11      :
     : No. 89 ADOPTIONS 2014

IN THE ADOPTION OF      : IN THE COURT OF COMMON PLEAS OF
J████ M████      : CUMBERLAND COUNTY, PENNSYLVANIA
     : ORPHANS COURT DIVISION
DOB: 10/██/12      :
     : No. 90 ADOPTIONS 2014

IN THE ADOPTION OF      : IN THE COURT OF COMMON PLEAS OF
AV████ M████      : CUMBERLAND COUNTY, PENNSYLVANIA
     : ORPHANS COURT DIVISION
DOB: 1██/14      :
     : No. 91 ADOPTIONS 2014

### IN RE: OPINION PURSUANT TO PA.R.A.P. 1925

**Peck, J., September 2, 2015.**

Appellant M████ P████ (hereinafter "Mother") is the biological mother of Am████ M████ (born 12/██/11), J████ M████ (born 10/██/12), and Av████ M████ (born 1/██/14)(collectively, the "Children"). On November 25, 2014, Cumberland County Children and Youth Services (hereinafter "CYS") filed a Petition for Involuntary Termination of Parental Rights of M████ P████ Under Section 2512 of the Adoption Act (hereinafter the "Petition for Involuntary Termination" or the "Petition") in each of the above-docketed cases in order to terminate Mother's parental rights. CYS listed 23 Pa.C.S. § 2511(a)(2), (a)(5), (a)(8), and (b) as the statutory grounds for termination. Michael J. Whare was appointed to represent Mother,[1] and hearings were held on this matter on January 14, 2015 and April 8, 2015. A third hearing was scheduled for May 12, 2015 in order for Mother to give testimony, but Mother was not

---

[1] Order of the Court, January 9, 2015.

1

present for the scheduled hearing.[2] On May 12, 2015, this Court took the matter under advisement. In an Order dated June 9, 2015, this Court granted the Petition for Involuntary Termination and terminated Mother's parental rights as to all three Children. On July 9, 2015, Mother filed a Notice of Appeal and a Statement of Errors Complained of on Appeal, alleging the following:

1. The Honorable Court erred as a matter of law and abused its discretion in changing the goal to adoption and terminating Appellant's parental rights in that Appellant is able to provide the children with essential parental care, control, and subsistence in the very near future.

2. The Honorable Court erred as a matter of law and abused its discretion in terminating Appellant's parental rights in that the conditions which led to the removal or placement of the children no longer existed or were substantially eliminated.

3. The Honorable Court was in error in determining the best interest of the children would be served by terminating Appellant's parental rights.

Pursuant to Pa.R.A.P. 1925(a), this Opinion is written in support of this Court's decision to terminate Mother's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

M⬛⬛ P⬛⬛ is the biological mother of Am⬛⬛, J⬛⬛, and Av⬛ M⬛⬛. The dependency date for Am⬛⬛ and J⬛⬛ was September 19, 2013, and the dependency date for Av⬛ was June 12, 2014.[3] CYS first became involved with Am⬛⬛'s and J⬛⬛'s well-being as a result of referrals for concerns regarding marijuana use in the household, unstable housing, and a lack of food in the household.[4] Am⬛⬛ and J⬛⬛ were first placed in the foster care of B⬛⬛ and A⬛ S⬛⬛

---

[2] Notes of Testimony May 12, 2015, p. 2.

[3] Notes of Testimony January 14, 2015 (hereinafter "N.T. Jan. 14"), p. 10-11.

[4] Testimony of Amanda Sigrist, January 7, 2015, p. 6.

2

(hereinafter the "S▬es" or the "S▬ family") in September of 2013, but were taken out of foster care and returned to the care of their maternal grandparents in February of 2014.[5] From February 24, 2014 until May 22, 2014, Mother and the Children were living with the Children's maternal grandparents, but when the Children's maternal grandmother began having problems with her health, the Children began living solely with Mother.[6] On May 31, 2014, barely more than a week after the Children had been placed in the sole care of Mother on May 22, 2013, CYS received another referral.[7] This referral was the result of an incident whereby Mother left the Children in a car with an unfamiliar gentleman while she visited a friend in the hospital.[8] The gentleman, who had given Mother and the Children a ride to the hospital, needed to leave before the Mother returned (after an hour) and the gentleman then brought the Children into the hospital and left them with the hospital staff.[9] The hospital staff found that the Children's hygiene was extremely poor, that the Children were wearing dirty diapers, and that the Children did not have any food or drinks.[10]

As a result of the hospital incident and corresponding referral, the Children were returned to the foster care of the S▬ family on June 2, 2014.[11] This was Av▬'s first time in foster care, since she had not been born the first time that Am▬ and J▬ were placed with the S▬es.[12] All three children have remained in the custody of the S▬ family since June 2, 2014.[13] At the time of the hearings, the S▬ family expressed their intention to adopt the Children.[14] By all accounts, the S▬ family provided a loving, stable home for the Children, and the Children get along well with the S▬'s other children.[15]

---

[5] N.T. Jan. 14, p. 53.
[6] N.T. Jan. 14, p. 30.
[7] N.T. Jan. 14, p. 30.
[8] N.T. Jan. 14, p. 11.
[9] N.T. Jan. 14, p. 11.
[10] N.T. Jan. 14, p. 11.
[11] N.T. Jan. 14, p. 10, 53.
[12] N.T. Jan. 14, p. 10.
[13] N.T. Jan. 14, p. 53,
[14] N.T. Jan. 14, p. 54.
[15] N.T. Jan. 14, p. 27-28, 53.

3

After the initial dependency and placement of J███ and Am███, CYS filed a Service Plan for Mother on September 20, 2013, which included the following goals:

(1) Cooperate with CYS;

(2) Maintain Mental Health;

(3) Remain Drug and Alcohol Free;

(4) Obtain and maintain stable housing and income;

(5) Demonstrate appropriate parenting skills; and

(6) Cooperate with adult probation requirements.

The Court heard the following testimony regarding Mother's progress towards meeting each of these goals, which was uncontradicted because Mother failed to appear before the Court to give her testimony.

In regards to Mother's first goal, cooperation with CYS, this Court heard testimony that Mother's cooperation has been sporadic.[16] Mother maintained good contact with CYS when Pamela Gross, caseworker (hereinafter, "Ms. Gross") was appointed to the case in August of 2014, lost touch except for two conversations at the end of the month in October, completely lost contact in November, and then re-established contact in December, after the Petition for Involuntary Termination was filed.[17] Furthermore, while Mother made progress with signing releases for CYS since December, again after the Petition for Involuntary Termination was filed, she has not always been compliant in that regard.[18] Finally, Mother has failed to include CYS in a meaningful way in her efforts to meet her other goals, such as her goals to maintain her mental health and remain drug and alcohol free. For example, while Mother underwent both a mental health evaluation and a drug and alcohol evaluation, she did so without first telling CYS or executing a release, so CYS was unable to provide input for those evaluations.[19]

---

[16] N.T. Jan. 14, p. 12.

[17] N.T. Jan. 14, p. 12.

[18] N.T. Jan. 14, p. 12.

[19] N.T. Jan. 14, p. 15-16.

4

Mother failed to meet her goal of maintaining her mental health.[20] While Mother reported to CYS that she was undergoing counseling and taking medications, she was unable to provide CYS with any information about when and where her self-reported appointments were taking place.[21] As mentioned above, Mother did undergo a mental health evaluation through Youth Advocate Services on October 28, 2014, but she failed to provide CYS with an opportunity to provide input into that evaluation.[22] Furthermore, Mother indicated to CYS that the evaluation resulted in no recommendations, but when CYS received a copy of the evaluation on November 13, 2014, it indicated that Mother's participation in outpatient therapy was recommended.[23] Mother recently provided documentation that she is scheduled to start receiving mental health services through Youth Advocate Services.[24]

Mother further was to remain drug and alcohol free. Despite negative drug tests in February and June of 2014,[25] this Court heard testimony that Mother has not cooperated with urine testing after June of 2014.[26] Furthermore, when Av⬛ was born in January of 2014, her meconium tested positive for THC.[27] Mother underwent a drug and alcohol evaluation with White Deer Run on October 27, 2014, but, again, failed to inform CYS of this evaluation ahead of time, thus depriving CYS of the ability to provide input.[28] The drug and alcohol evaluation resulted in a recommendation of intensive outpatient therapy, however Mother did not complete the recommended therapy.[29] Mother was officially discharged from the outpatient therapy program on November 10, 2014 due to noncompliance with attendance policies after missing or cancelling appointments on November 3rd and 5th.

---

[20] N.T. Jan. 14, p. 13.
[21] N.T. Jan. 14, p. 13.
[22] N.T. Jan. 14, p. 15.
[23] N.T. Jan. 14, p. 15.
[24] N.T. Jan. 14, p. 13.
[25] N.T. Jan. 14, p. 38.
[26] N.T. Jan. 14, p. 16.
[27] N.T. Jan. 14, p. 44.
[28] N.T. Jan. 14, p. 16.
[29] N.T. Jan. 14, p. 16.

Regarding Mother's goal of obtaining and maintaining stable housing and income, this Court heard testimony that this goal has not been met. Ms. Gross testified that Mother has provided conflicting information regarding her residence since the Service Plan was put into place in September of 2013.[30] Testimony was given that Mother has provided CYS with nine different addresses between January of 2014 and January of 2015,[31] including the following addresses: 335 Pine Street, Steelton (July 2014); Vernon Street, Harrisburg (August 2014); 329 Spring Street (October 2014); 310 North Third Street (October 2014); 335 Pine Street, Steelton (December 2014).[32] Despite the multiple addresses given between July and December of 2014, Mother later insisted to CYS that she has resided at the 335 Pine Street address for six consecutive months.[33] CYS did visit Mother at the 335 Pine Street address in December of 2014, and confirmed that Mother and her newborn child (who is not involved in the present matter) live there with the gentleman who owns the property, and that Mother provides care for the gentleman in lieu of paying rent.[34] While the home is small, CYS did find it to be suitable for the newborn baby, and it does have beds for the Children at issue in this matter.[35] However, CYS did have concerns that there was a "for sale" sign in front of the house, which may or may not force Mother to vacate the property if it is sold.[36]

The information that Mother has provided to CYS regarding her income has been equally unreliable. In February of 2014, Mother indicated that she was working for Applebee's, but CYS never received confirmation that she had been working there.[37] In July, Mother indicated that she was working at Nyree's restaurant in Harrisburg, but she did not provide CYS with any pay stubs or other proof that she was working there, and CYS was unable to confirm his employment with anyone at Nyree's.[38] In August of

---

[30] N.T. Jan. 14, p. 47.
[31] N.T. Jan. 14, p. 47.
[32] N.T. Jan. 14, p. 16-17.
[33] N.T. Jan. 14, p. 17.
[34] N.T. Jan. 14, p. 17-18.
[35] N.T. Jan. 14, p. 17.
[36] N.T. Jan. 14, p. 18-19.
[37] N.T. Jan. 14, p. 20.
[38] N.T. Jan. 14, p. 21.

6

2014, Mother indicated that she was going to be employed by Staffmark Employment Agency, but when CYS contacted Staffmark, they indicated that Mother had not been their employee since April of 2014, and that they did not plan to hire her back.[39] Mother provided pay stubs to CYS in November of 2014 to prove that she was working eight hours per week for Menlo Logistics.[40] In December of 2014, Mother reported she was working in a temporary position for Berks & Beyond, but would be unable to continue this employment during the final stages of her pregnancy.[41] Mother indicated to CYS that she has returned to her work at Berks & Beyond following the birth of her newborn child.[42] CYS is unsure of the hours, the type of work, and the compensation Mother is receiving at Berks & Beyond.[43]

Mother failed to meet her goal of demonstrating appropriate parenting skills. Mother agreed to pursue parenting services through Alternative Behavior Consultants (hereinafter "ABC"), but was discharged from the program due to her failure to attend scheduled appointments.[44] On October 29, 2014, Mother reported that she was receiving parenting services through Tri-County Community Action in Harrisburg (hereinafter "Tri-County"), and CYS received confirmation that Mother completed a five week parenting course.[45] CYS indicated several concerns with this five week course, including the fact that the course did not involve "hands-on" learning with the Children, and it did not address boundaries with the children, supervision, or discipline. Furthermore, the five week course included only seven total hours of instruction,[46] as opposed to the twenty hours of instruction Mother would have received through ABC.[47]

Also in regards to Mother's parenting, this Court heard credible testimony that Mother requested only minimal visitation with the Children. Since the Children were

---

[39] N.T. Jan. 14, p. 21.
[40] N.T. Jan. 14, p. 21.
[41] N.T. Jan. 14, p. 20.
[42] N.T. Jan. 14, p. 20.
[43] N.T. Jan. 14, p. 22.
[44] N.T. Jan. 14, p. 22.
[45] N.T. Jan. 14, p. 22-23.
[46] N.T. Jan. 14, p. 23-24.
[47] N.T. Jan. 14, p. 49.

placed back in foster care in May of 2014, Mother's first visit with them was after a hearing on July 24, 2014.[48] Mother's first requested visit with the Children was on August 5, 2014, at ABC.[49] After that time, Mother did not visit with the Children at all through the rest of August, and through all of September, October, and November,[50] despite CYS's willingness to arrange transportation and set up visits at Tri-County, which was a more convenient location for Mother.[51] In December, once Mother re-established contact with CYS and Tri-County, but again after the Petition for Involuntary Termination was filed, Mother began having visitation with the Children again, including visits on December 16, 2014 and January 8, 2015.[52] This Court heard testimony that after the Children have had visits with Mother, they have each exhibited concerning behavior as follows when returned to the S█████ family: Am█████ has thrown multiple temper tantrums, had a hard time settling down for bed, and has repeatedly defecated herself;[53] J█████ has seemed unsettled and both urinated and defecated himself;[54] Av█████ has had trouble keeping her formula down, and has repeatedly spit-up.[55] This Court heard testimony that each of these behaviors were either out of the norm for the Children, or were issues that had previously been resolved.[56]

Finally, Mother's goal of cooperating with adult probation has not been met. This Court heard testimony that Mother has outstanding objectives to remain complaint with probation, including completion of the Bair Foundation B.E.S.T. Program and managing medication pursuant to the recommendations of a mental health evaluation.[57] While Mother completed the mental health evaluation in October of 2014, CYS was unaware of Mother's efforts to manage the medicine, Latuda, which was recommended in the mental

---

[48] N.T. Jan. 14, p. 24.
[49] N.T. Jan. 14, p. 24.
[50] N.T. Jan. 14, p. 24.
[51] N.T. Jan. 14, p. 40.
[52] N.T. Jan. 14, p. 40-41.
[53] N.T. Jan. 14, p. 60.
[54] N.T. Jan. 14, p. 61-62.
[55] N.T. Jan. 14, p. 62.
[56] N.T. Jan. 14, p. 60-62.
[57] N.T. Jan. 14, p. 45.

health evaluation.[58] Additionally, this Court heard testimony that Mother has not completed the B.E.S.T. program.[59]

As a result of Mother's failure to meet the goals outlined in the September 20, 2013 Service Plan, as well as the S███ family presenting itself as an adoptive resource, CYS filed the Petition for Involuntary Termination. This Court granted the Petition for Involuntary Termination, thus terminating Mother's parental rights as of June 9, 2015. This appeal followed.

## DISCUSSION

Under Pennsylvania's jurisprudence, a trial court must conduct a two-pronged analysis under 23 Pa.C.S. § 2511 when deciding whether to involuntarily terminate the parental rights of a natural parent. *See In re I.G.*, 939 A.2d 950, 952 (Pa. Super. 2007). First, a court must determine whether appropriate grounds for involuntary termination of parental rights exist under § 2511(a). *Id.* If grounds exist under section (a), then the court must determine whether the termination of parental rights is in the best interest of the children under § 2511(b). *Id.* Under section (a), the focus is on the parent's conduct, while under section (b), the focus is on the needs of the child. *Id.* at 956. It is well established that a party seeking termination of parental rights bears the burden of establishing, by clear and convincing evidence, that grounds for involuntary termination exist. *Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

In the present case, the Petition for Involuntary Termination filed by CYS sought to terminate Mother's parental rights under several provisions of Section 2511(a) of the Adoption Act. The particular subsections of the Act relied upon by CYS provide as follows:

> (a) General Rule – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ...
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions

---

[58] N.T. Jan. 14, p. 45-46.
[59] N.T. Jan. 14, p. 45.

and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

...

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

...

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(2),(5), and (8).

Although CYS listed subsections (2), (5), and (8) as its grounds for involuntary termination, it only needed to prove that grounds for termination existed under any one of the subsections. *In re: L.S.G.*, 767 A.2d 587, 590-91 (Pa. Super. 2001). As set forth in more detail below, this Court found clear and convincing evidence to support termination of Mother's parental rights under § 2511(a)(2), and it also found that termination of Mother's rights was in the best interest of the children under § 2511(b). Because this Court finds that sufficient grounds exist under §2511(a)(2), this Court constrains its analysis to that subsection.

I.      **Sufficient grounds existed for involuntary termination under 23 Pa. C.S. § 2511(a)(2).**

Under § 2511(a)(2), this Court found that the repeated and continued incapacity of Mother, as well as neglect by Mother, has caused the Children to be without essential parental care, and that the conditions causing the same cannot or will not be remedied by Mother. As the Superior Court has noted,

> The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to

10

affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. Nevertheless, parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of resources, may properly be rejected as untimely or disingenuous.

*In re of K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

In the present case, this Court found that Mother failed to utilize all of the resources provided to help make her a better parent and to help support a parent-child relationship. Furthermore, this Court did not find that Mother is capable of remedying the incapacity and neglect in order to provide care for the Children in the immediate future.

At the time that J████ and Am█████ were originally adjudicated as dependent, Mother received a Service Plan, which contained many goals designed to make Mother a better parent and to reunite her with the Children. Undoubtedly, meeting the goals outlined in the Service Plan would require significant life changes on Mother's behalf, but life changes were necessary for Mother in order for her to be an effective parent. Almost two years have now passed since the Service Plan was created in September of 2013, and Mother has not met any of the six goals, and her progress toward meeting the same has been minimal at best.

When Mother had the opportunity to better herself as a parent by attending the outpatient mental health counseling, intensive outpatient drug and alcohol counseling, and parenting courses required by CYS, Mother regularly cancelled or did not show up to her appointments, repeatedly resulting in her dismissal. When CYS sought to arrange transportation and set up visits with the Children at Tri-State for Mother's convenience, Mother was unreachable. Likewise, when Mother had the opportunity to give testimony before this Court as to why she is a fit parent, she once again was not present. Mother was given another opportunity to resume her full parental responsibilities of J████ and Am█████ when they were placed with Mother in May of 2014, yet Mother cared for them for just nine days before they, along with Av███ were found dirty and hungry after being left at a hospital with a stranger.

11

This Court believes that taking an active interest in the judicial process, cooperating with CYS, and working to reach the goals set in a service plan are all "necessary steps to supporting a parent-child relationship" where the children have been adjudicated as dependent, such as in the present case. *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008). After giving Mother a significant amount of time to meet these goals and better herself as a person and parent, this Court no longer believes that Mother is capable of remedying the incapacity and neglect which led to the Children's placement in September of 2013 and in June of 2014.

## II. Involuntary termination is in the best interest of the Children under 23 Pa. C.S. § 2511(b).

Unlike the analysis a court conducts under § 2511(a), the analysis under § 2511(b) focuses on the interests of the child. This analysis includes "weighing the needs and welfare of the child, as well as an examination of the emotional bond between parent and child... which 'encompasses intangibles such as love, comfort, security, and stability.'" *In re I.G.*, 939 A.2d at 956 (citing *In re D.W.*, 856 A.2d 1231, 1234 (Pa Super. 2004); quoting *In re Adoption of R.J. S.*, 901 A.2d 502, 514 (Pa. Super. 2006)).

In the present case, it is apparent to the Court that Mother loves the Children, but, as noted above, analysis under § 2511(b) focuses on the Children, not the parents. From the Children's point of view, this Court questions the bond that may exist between the Children and their Mother. The Children were each placed into foster care at a young enough age that the bond between parent and child was never fully formed with their biological Mother. At the time that Am████ and J████ were first adjudicated as dependent and taken out of Mother's care in September of 2013, they were approximately two years old and one year old, respectively. When Av████ was taken out of Mother's care in June of 2014, she was approximately six months old. Since their placement in the S████'s foster care in June of 2014, Mother has seen the Children four times. This Court heard testimony that the Children were fearful and apprehensive about visiting with

12

Mother,[60] and that they have exhibited concerning behavior following their visits.[61] As such, this Court found that at best a limited emotional bond exists between Mother and the Children, and that such bond is not so strong as to render termination of Mother's parental rights unwise.

Concerning the mental and physical needs of the Children, this Court believes that the Children have a great need for stability and permanence in their lives. All three Children have now been living in the S████'s home for more than a year. The evidence showed that The S████es have provided a safe, stable, and loving environment for the children, and that a strong bond exists between the children and the S████es. Furthermore, the S████es planned to adopt all three children if given the opportunity. This Court found at the time of the hearing that adoption by the S████es would provide the permanency that these children desperately need. In contrast, as noted above, Mother has continually faced stability problems with both income, housing, and sobriety, and is not exhibiting behavior that those issues will be resolved any time soon. Thus, the S████ family can provide the Children with the stability and permanence that they need, whereas Mother cannot.

Therefore, this Court found that involuntary termination of Mother's parental rights is in the best interest of all three Children.

## CONCLUSION

In summary, this Court found clear and convincing evidence to support termination of Ms. P████s' parental rights under 23 Pa. C.S. § 2511(a)(2), based on Mother's continual failure to cooperate with CYS, her failure to make progress toward the goals established in her Service Plan, and her failure to participate in the judicial proceedings concerning her children. Furthermore, this Court found that termination of Mother's parental rights under § 2511(b) is in the best interest of the children because

---

[60] N.T. Jan. 14, p. 58.
[61] N.T. Jan. 14, p. 59-62.

Mother is unable to provide the stable environment that the children need.

BY THE COURT,

_Christylee L. Peck_      J.
Christylee L. Peck,      J.

Lindsay D. Baird, Esq.
16 West High Street
Carlisle, PA 17013
Attorney for Cumberland County
Children and Youth Services

Cindy L. Villanella, Esq.
875 Market Street
Lemoyne, PA 17043
Guardian ad Litem

John J. Mangan, Esq.
17 West South Street
Carlisle, PA 17013
Attorney for Biological Father

Joseph L. Hitchings, Esq.
5000 Ritter Road
Suite 202
Mechanicsburg, PA
Attorney for Shane Wright
(No. 91 Adoptions 2014)

Bret Shaffer, Esq.
2080 Linglestown Road
Harrisburg, PA 17110
Attorney for Foster Parents

Michael J. Whare, Esq.
37 E. Pomfret Street
Carlisle, PA 17013
Attorney for Mother

14